## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MARK DONELSON, individually and on behalf of all others similarly situated, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) JURY TRIAL DEMANDED |
| AMERIPRISE FINANCIAL SERVICES, INC., JAMES M. CRACCHIOLO, KELLI HUNTER PETRUZILLO, NEAL MAGLAQUE, PATRICK HUGH O'CONNELL and MARK SACHSE, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT FOR VIOLATION OF
## FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY

Individually and on behalf of all other persons similarly situated, plaintiff Mark Donelson

("Donelson") alleges and states the following, whether based upon his actual, personal knowledge

of the acts, statements, occurrences and events described hereinbelow, or upon information and

belief resulting from the analysis, by his counsel, of publicly-filed documents, announcements

and/or statements made, published or relating to defendants Ameriprise Financial Services, Inc.

("Ameriprise"), James M. Cracchiolo ("Cracchiolo"), Kelli Hunter Petruzillo ("Petruzillo"), Neal

Maglaque ("Maglaque"), Patrick Hugh O'Connell ("O'Connell") and/or Mark Sachse ("Sachse")

(collectively "Defendants" or "Ameriprise Defendants").

## NATURE OF THE ACTION

1.     This is a securities fraud and breach of fiduciary class action on behalf of all persons

who, during the five (5) year period next-preceding the date of filing of this Complaint were

customers or clients of Ameriprise and Sachse or were otherwise provided with brokerage,

financial advisory and/or investment advisory services by Ameriprise and Sachse for the reasons that during such period, Ameriprise Defendants have, *inter alia*:

<ol type="a">
<li>Made false, misleading and/or deceptive statements and/or failed to disclose material information to Donelson and other similarly situated investors ("Other Investors") with the intent and for the purpose of inducing them to open, keep or maintain "brokerage" and/or "advisory" accounts at Ameriprise and in the context of those accounts, to place substantial sums of money within the management, direction and control of Ameriprise;</li>

<li>Disregarded the investment objectives of Donelson and Other Investors with respect to the substantial sums which they invested with or otherwise entrusted to Ameriprise;</li>

<li>Executed securities transactions that were unauthorized by or otherwise unsuitable for Donelson and Other Investors, all for the purpose and with the intent of increasing the fees paid and payable to Ameriprise by such customers, or otherwise chargeable against the assets or investments of Donelson and Other Investors;</li>

<li>Breached their duties of care with respect to Donelson and Other Investors through frequent and unnecessary trading in disregard of customers' investment objectives and market conditions;</li>

<li>Depleted such customers' investments, as a consequence of trading losses, fees, commissions and other unnecessary and exorbitant charges;</li>

<li>Misrepresented and/or failed to disclose material information to Donelson and other investors regarding the amount of fees, commissions and charges which such customers would become obligated to pay to Ameriprise;</li>

<li>Breached their fiduciary duty to Donelson and to Other Investors who, like Donelson, were trusting and unsophisticated by "churning" brokerage accounts;</li>

<li>Failed to disclose material information or manipulated assets and investments which Donelson and Other Investors placed in Ameriprise's control by using such assets to make other self-interested investments, ostensibly on their customers' behalf but of benefit only to Ameriprise;</li>

<li>Caused or permitted defendant Sachse, a person who had been disciplined, censured, suspended and eventually disbarred permanently from the practice of law as a result of his serial breaches of fiduciary duties to a number of his "clients," to become an Ameriprise broker/dealer, investment advisor and/or financial advisor responsible for the care, custody and management of Donelson's investments and the investments of Other Investors;</li>
</ol>

2

j.     Failed to properly supervise, manage and direct defendant Sachse in the performance of his duties and responsibilities to Donelson and Other Investors, notwithstanding his prior, repeated and formerly-adjudicated breaches of fiduciary duty;

k.     Made false, misleading and/or fraudulent statements to Donelson and Other Investors to the effect that all losses in value of securities which they had purchased on defendant Sachse's recommendation would be "made up by Merrill Lynch" from whom Sachse had allegedly received the "tip" which he used to induce Donelson and Other Investors to purchase such securities, originally;

l.     Through the use of false, misleading and/or fraudulent statements, caused or induced Donelson and Other Investors to liquidate all or most of their securities each year or in given years on grounds that "losses" in the value of securities which defendant Sachse had recommended and purchased for them could be "offset" for tax purposes against the proceeds of other securities which had increased in value, notwithstanding that such performing securities had been acquired by Donelson and Other Investors with the intention that they be used as a source of dividend income and otherwise with the expectation of significant gain long-term rather than for short-term profit;

m.     Disregarded repeated instructions by Donelson and Other Investors that they did not wish to purchase any securities on credit or "margin" and, on the contrary, continued to purchase securities, on margin, for or to the account of Donelson and Other Investors for the single purpose of increasing Ameriprise's income from the interest payments which were then assessed against such investors investment accounts;

n.     Made false, misleading and/or fraudulent statements to Donelson and Other Investors to the effect that Ameriprise had been effecting a "computer change-over" and/or that the "computer system" used to generate the "paper account statements" delivered periodically to Donelson and other customers and that the disruption of its data processing system was the reason or the only reason why the customer account statements of Donelson and Other Investors continued to show transactions "on margin" from which such customers had ordered Ameriprise to abstain;

o.     Falsely, fraudulently and deceptively misrepresented to Donelson and Other Investors that their "accounts at Ameriprise were frozen" as necessary, allegedly, to permit Ameriprise to "correct glitches" in its computer system thus preventing such persons from obtaining or exercising effective access to the cash, securities or other assets in their "Ameriprise accounts" and, *inter alia*, depriving them, for extended periods, the opportunity to use such cash or to trade in such assets or securities;

3

p.    In the context of false, misleading and/or fraudulent statements made to Donelson and Other Investors by defendant Cracchiolo, defendant Sachse and Ameriprise employees "Ron Lyle," "Ted Brail" and "Ted Trimble," Ameriprise promised and assured Donelson and Other Investors that they would be "paid", in cash, by "check" in remediation for the loss, injury and damage suffered by such customers as a result of the acts, omissions, statements, breaches of duty and conduct identified above and described, with particularity, in the allegations which follow;

q.    Alternatively and if Ameriprise's representations to that effect are to be believed, caused, suffered, or permitted defendant Sachse and/or unknown persons acting in concert with him, to "impersonate" defendant Cracchiolo as well as Ameriprise employees "Ron Lyle," "Ted Brail" and "Ted Trimble" and, under that guise, to represent to, promise and assure Donelson and Other Investors that they would be paid substantial sums, in cash, in remediation of the loss, injury and damage which they had suffered as a result of the acts, omissions, statements, breaches of duty and/or conduct identified in this ¶ 1 and otherwise described with particularity in the allegations which follow.

## VIOLATIONS OF FEDERAL SECURITIES LAWS AND BREACHES OF FIDUCIARY DUTY

2.    Ameriprise, by and through Ameriprise Defendants and/or its other agents, employees, representatives, associates and/or instrumentalities, whether acting singularly, or in concert, has engaged in transactions, acts, practices, courses of business and/or failures to act that constitute violations of §§ 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5, as promulgated thereunder by the Securities & Exchange Commission ("SEC").

3.    Ameriprise, by and through Ameriprise Defendants and its other agents, employees, representatives, associates and/or instrumentalities, whether acting singularly or in concert, has engaged in transactions, acts, practices, courses of business and/or failures to act which have resulted in serial breaches of its fiduciary, best interests and other and further duties to Donelson and Other Investors as those duties are identified in, *inter alia*, § 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6 ("Advisers Act"), the Dodd-Frank Wall Street Reform and

4

Consumer Protection Act ("Dodd-Frank"), 15 U.S.C. § 78o, 15 U.S.C. §§ 1601, 1602 and 1631, *et seq.* and otherwise applicable law.

## PARTIES

4.     Plaintiff Donelson is a citizen of the state of Missouri residing in Clay County, Missouri.

5.     Ameriprise is a corporation organized and existing under the laws of the state of Minnesota having its principal place of business in Minnesota.

6.     Defendant Sachse is a citizen and resident of the state of Kansas and was, at all times relevant to the allegations appearing in this Complaint, a broker-dealer and investment advisor employed by or otherwise associated with Ameriprise who was, or held him out to Donelson, investors and the public as, an "Associate Vice President" of Ameriprise.

7.     Defendant Cracchiolo is a citizen and resident of the state of Minnesota and was, at all times relevant to the allegations appearing in this Complaint, the Chairman and "Chief Executive Officer" of Ameriprise and with respect to those allegations, a controlling person of Ameriprise and Sachse within the meaning of § 20 of the Securities Exchange Act, 15 U.S.C. § 78t.

8.     Defendant Petruzillo is a citizen and resident of the state of Minnesota and was, at all times relevant to the allegations appearing in this Complaint, the Executive Vice President Human Resources of Ameriprise responsible for attracting, developing, training and supervising associate brokers/investment advisors such as "Associate Vice President" Sachse and thus, for purposes of and with respect to those allegations, a controlling person within the meaning of § 20 of the Securities Exchange Act, 15 U.S.C. § 78t.

9.	Defendant Maglaque is a citizen and resident of the state of Minnesota and was, at all times relevant to the allegations appearing in this Complaint, the President, Advice & Wealth Management Business Development & Chief Operating Officer of Ameriprise, responsible for recruiting, developing and supervising associate brokers/financial advisors such as "Associate Vice President" Sachse and thus, for purposes of those allegations, a controlling person within the meaning of § 20 of the Securities Exchange Act, 15 U.S.C. § 78t.

10.	Defendant O'Connell is a citizen and resident of the state of Minnesota and was, at all times relevant to the allegations appearing in this Complaint, the Executive Vice President, Ameriprise Advisor Group and Ameriprise Financial Institutions Group, responsible for the overall leadership of associate brokers/investment advisors such as "Associate Vice President" Sachse and thus, for purposes of those allegations, a controlling person within the meaning of § 20 of the Securities Exchange Act, 15 U.S.C. § 78t.

## JURISDICTION AND VENUE

11.	When committing, or in connection with, the acts, conduct and/or wrongs identified in the preceding paragraphs and otherwise described, with particularity, in the allegations which follow, Ameriprise used or employed, whether directly or indirectly, the means and instrumentalities of interstate commerce including, without limitation, the United States mail, interstate telephone and electronic communications and the facilities of one or more national securities exchanges.

12.	This Court has jurisdiction over the subject matter of this action for the reason that it is, *inter alia*, an action arising under 15 U.S.C. Chapter 2B and otherwise an action arising under the laws of the United States within the meaning of § 27 of the Exchange Act, 15 U.S.C. § 78a and 28 U.S.C. § 1331.

6

13.     Alternatively, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 for the reason that it is an action between citizens of different states wherein the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) for the reason that Ameriprise conducts and at all relevant times has conducted business within this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.     Overview

15.     Donelson restates and incorporates herein, *seriatim*, the allegations appearing in ¶¶ 1-14 hereinabove.

16.     Donelson is now 58 years of age.  His formal education ended at twelfth grade.

17.     For the last 28 years, Donelson has been employed by Sam's West, Inc., a wholly-owned subsidiary of Wal-Mart Stores, Inc.  Currently, Donelson is a "picker" at "Sam's Club"® facility No. 8207 in Gladstone, Missouri responsible for filling telephone and other orders for the purchase of merchandise.

18.     Donelson has received no training, education or instruction, of any kind, whether general or specialized, in the purchase or sale of stocks, bonds, instruments or other securities, or in the practice of investing in stocks, bonds, instruments or other securities.

### B.     The Inception of Donelson's Relationship With Sachse

19.     Donelson met defendant Sachse in early 2008.  At the time, Donelson was a customer/client of Robert W. Baird & Co. ("Baird"), a "retail" broker-dealer and "financial advisor" having offices in Kansas City, Missouri.

20.     Sachse contacted Donelson by telephone, telling him that:

7

      a.      Sachse just became a broker-advisor at Baird's Kansas City, Missouri office and had "heard" that Donelson was adept at trading "options;"

      b.      Sachse himself had a "license" to "trade options;"

      c.      Sachse would enjoy "working with" Donelson.

21.     Subsequently, Donelson met face-to-face with Sachse. The two "hit it off very well," Donelson who "worked nights" at Sam's Club began using Sachse as his broker/advisor at Baird and Donelson made it a habit to visit with Sachse, face-to-face, usually at a coffee shop near Baird's Kansas City office almost every Friday. On these occasions, Donelson and Sachse would chat for 15-20 minutes.

### C. Sachse Fails to Inform Donelson That He is a Former Attorney Who Has Been Disbarred From the Practice of Law, Permanently, for Professional Misconduct

22.     During one of the conversations detailed in the preceding paragraph, Sachse informed Donelson that he had been an attorney at law, licensed as such in the state of Kansas and specializing in "criminal practice." Sachse said that he had withdrawn from law practice voluntarily because he no longer "liked" it. What Donelson did not know and did not learn for many years is that:

      a.      According to Kansas Supreme Court Bar Docket No. 12956 and the Order of Disbarment dated September 27, 2007 that appears therein, Sachse was informally admonished by the Kansas Supreme Court, at least twice, for "unprofessional conduct;"

      b.      On July 14, 2000, Sachse was placed on supervised probation for two years as evidenced by the reported decision in In re Sachse, 269 Kan. 810 (2000);

      c.      On June 9, 2006, the Kansas Supreme Court suspended Sachse from the practice of law for a period of one year, In re Sachse, 281 Kan. 1197 (2006);

      d.      During the time that Sachse was a duly-licensed attorney at law, 17 complaints were filed against him by his clients;

<blockquote>
e. The Kansas Client Protection Fund paid out a total of $27,650 in compensation to eight of Sachse's clients, each of whom had suffered monetary loss as a result of his misconduct; and

f. Sachse was disbarred from the practice of law by order of the Kansas Supreme Court entered September 27, 2007.
</blockquote>

### D. Sachse Becomes a "Broker-Investment Advisor" at Ameriprise and Donelson "Transfers" His Brokerage Account to Ameriprise

23. In 2010, Sachse terminated or otherwise ended his employment at Baird and became a broker-investment advisor at Ameriprise. Sachse said that he moved to Ameriprise in order to "make more money." Sachse then invited Donelson to "move" his investment account from Baird to Ameriprise and Donelson did as Sachse asked.

24. At the inception of his relationship with Ameriprise, Donelson informed Sachse and thus Ameriprise of each and all of the following:

<blockquote>
a. Donelson would continue to use the brokerage account for the trading of options what Donelson described as "puts and calls" and thus for purposes of achieving short-term gain;

b. Securities acquired by and held in the brokerage account, other than options, were to be acquired and held for purposes of long-term appreciation and thus as a means of funding Donelson's retirement;

c. Donelson had not and would not, under any circumstances, "trade on margin," i.e. on credit advanced by the broker-dealer and secured by the cash and other assets in Donelson's "brokerage account."
</blockquote>

25. In response, Sachse told Donelson that Donelson "would not have to" trade "on margin" and when asked by Donelson whether he was "sure" that in fact no trades in Donelson's brokerage account would be accomplished "on margin," Sachse told Donelson "absolutely, you do not have to use margin."

### E. Notwithstanding Donelson's Instructions to the Contrary, Sachse Uses the Cash and Other Assets Contained in Donelson's Account to Purchase Securities on Credit/Margin

9

26.    Donelson received "monthly statements" from Ameriprise purporting to show "trading" and other activity in Donelson's brokerage account, all of which Ameriprise sent to Donelson by overnight delivery at a cost ranging from $20.00 to $25.00 per month.

27.    In mid-2012, Donelson noticed references to "margin" and to trading transactions accomplished on "margin," on his monthly statements:

      a.    Donelson brought this to Sachse's attention;

      b.    Sachse told Donelson "no problem, I will fix it;"

      c.    Donelson emphasized to Sachse, again, that he did not wish to trade, at any time, "on margin;"

      d.    Sachse said he understood and that he would "take care of it;"

      e.    Donelson "believed" Sachse's statement.

28.    In truth and in fact, the problem was not "fixed" and in early 2013, Donelson told Sachse that he/they needed "help getting this problem fixed."

**F.    Sachse Professes to be Unable to Stop Trading of Securities Within Donelson's Brokerage Account "on Margin" and Enlists the Help of "Ted Brail," Another Ameriprise Employee**

29.    On a date well known to Ameriprise and believed, by Donelson, to be in March or April, 2013, Sachse told Donelson that he had made contact with another Ameriprise employee by the name of "Ted Brail" who was said to be associated with Ameriprise's "accounting department" and shortly thereafter, "Ted Brail" spoke with Donelson by telephone.

30.    During that call, "Ted Brail" told Donelson that Ameriprise was "very sorry about this" margin "problem" and that they would "get it taken care of."

31.    On a date well known to Ameriprise and believed, by Donelson, to be in May or June, 2013, otherwise some 45 days after this initial contact with "Ted Brail," Donelson informed

Sachse that references to trades "on margin" still appeared on his monthly brokerage statement and wondered why "Ted Brail" had not solved the "problem."

32.     Shortly after that conversation with Sachse, "Ted Brail" again spoke with Donelson by telephone; Brail apologized "many times" for the errant references to "margin trading," and he admitted that they all were Ameriprise's "fault."

33.     "Ted Brail" then told Donelson that Ameriprise would like to pay Donelson $40,000 in compensation for Donelson's "trouble." Donelson thanked "Ted Brail" for the payment but emphasized that it was of greatest importance that all margin transactions "be taken off of" Donelson's account.

34.     As of some 30 days later, in July or August, 2013, references to "trades" that had been accomplished "on margin" still appeared on Donelson's account and Donelson complained to Sachse. "Ted Brail" called Donelson once again to apologize and during that conversation:

      a.     Brail told Donelson that Ameriprise "would like to do something else" for Donelson;

      b.     Brail said that Ameriprise would pay Donelson "another $30,000 for" his trouble;

      c.     While thanking Ameriprise for the additional $30,000, Donelson instructed Brail, again, that all references to margin purchasing and all margin transactions needed to be "taken off" his brokerage account.

35.     As of 90 days thereafter, in September or October, 2013, the references to "margin transactions" still appeared on Donelson's account, Donelson complained to Sachse and Donelson asked Sachse:

      a.     When it was precisely that the references to margin transactions would be removed, in fact, from Donelson's account; and

      b.     When it was precisely that Donelson would get his "two checks totaling $70,000" from Ameriprise as promised by "Ted Brail."

36.     In response, Sachse told Donelson:

<blockquote>
a.       That it was a "big process … getting margin off" of Donelson's statements;

b.       That the payments/remittance of the two checks totaling $70,000 would have "to go through channels;"

c.       That Sachse was "working on" each of these problems.
</blockquote>

37.     Donelson never again heard from "Ted Brail" of Ameriprise.

**G.     After Liquidating All of the Securities in Donelson's Brokerage Account, Ameriprise Invests All Proceeds Thereof in a Proprietary Ameriprise "Money Market" Fund and Then Informs Donelson That This Asset and His Account are "Frozen" and Untradable as a Result of "Computer Problems" at Ameriprise**

38.     In January, 2014, Donelson learned that Sachse had liquidated all of Donelson's securities holdings and had "invested" the entirety of the proceeds thereof in Ameriprise's own proprietary "money market" fund, a fund sponsored by or operated through the "Bank of China."

39.     In January, 2014, Sachse told Donelson that all of Donelson's brokerage/investments were subject to "problems" that Ameriprise was having with its "computer system," all of which were the product of Ameriprise's "changeover" or "transition to" a "new computer" system.  Sachse told Donelson that he should "disregard" the monthly statements and that Donelson's account would remain "frozen" until that "problem" was solved.

40.     Sachse told Donelson that because his account was frozen, Donelson would be unable to "trade" any securities until Ameriprise's "computer system" was "fixed."

**H.     Sachse/Ameriprise Claim to Have Sent Checks Totaling $70,000 to Donelson in Compensation for These "Computer Problems," Which Checks are Allegedly "Mishandled" by "UPS" and Never Delivered to Donelson**

41.     On a date well known to Ameriprise but believed, by Donelson, to be in November or December, 2014, Donelson contacted Sachse who told him that the two checks which had been promised to him by Ameriprise, one in the amount of $40,000 and another in the amount of

$30,000 were at last "coming" to Donelson from Ameriprise and that the "margin problem" itself was "being fixed."

42.     When a further 30 days elapsed without either the receipt of "checks" or resolution of the "margin" problem, Donelson asked Sachse again about the "margin problem" as well as the status of the "two checks."   In response, Sachse told Donelson the following:

a.     That the checks had indeed been sent to Donelson by "UPS delivery," but that the delivery thereof to Donelson had been "messed up" by "UPS;"

b.     That Sachse "was going to stay in contact with UPS;" that although Donelson had asked Sachse for a UPS "tracking number," Sachse "could not give out the tracking number" and that Donelson could not "visit" UPS personally to "get" the "two checks" himself;

c.     That Sachse had gone to a UPS facility in Johnson County, Kansas in order to "pick up" Donelson's "two checks" and then deliver them to Donelson personally;

d.     That "people at UPS" had told Sachse that they already had been "loaded" on a UPS "truck" for "delivery" to Donelson.

43.     As of the end of January, 2015, the two checks which Sachse had told Donelson had been "loaded" on a "UPS truck" for "delivery" to him had not, in fact, been received by Donelson and Donelson's brokerage statements continued to show that Sachse was engaging in the purchase of securities on margin, purportedly on Donelson's behalf.

44.     At the end of January, 2015, Donelson told Sachse that Donelson had received no checks; that the margin "problem" had not been corrected; and that there were significant variances between what Sachse represented to be the kind and magnitude of the assets in Donelson's account and what the account statements themselves represented those assets to be.

45.     Sachse attempted to explain the statements to Donelson, but ended the conversation by informing Donelson again to disregard the monthly statements which, according to Sachse,

13

were and remained "messed up" as a result of the as-yet unresolved "problems" with Ameriprise's "computer system."

46.     During the year 2015 or thereafter, the two checks that Sachse had told Donelson were "on the truck" for delivery by UPS were never "delivered" to or received by Donelson nor was the "margin problem" with Donelson's brokerage account solved.

47.     In February or March, 2015, Donelson again complained to Sachse about his brokerage statements and again told Sachse that he did not understand the statements and the transactions depicted in the statements.

48.     Donelson did so on the telephone and during that conversation, Sachse told Donelson that he was even then "looking at" Donelson's account on his "office computer:"

    a.      Sachse asked what it was that Donelson "did not understand;"

    b.      Donelson told him that he did not "understand the cash" or the amount of cash in his account;

    c.      Sachse told Donelson that he had "pulled up" and was "looking at" Donelson's account was even then as depicted on Sachse's computer and that Donelson had fully $483,000 in cash in his account;

    d.      In response, Donelson told Sachse that according to the "paper copy" of the statement which he had just received, Donelson had only $250,000 in his account;

    e.      Sachse told Donelson that the "paper" statement was incorrect and that in fact Donelson had fully $483,000 in his account, that it was entirely in "cash" that was not encumbered by any "margin" obligations and that Donelson should "disregard" his "paper" account statements.

**I.      Donelson Instructs Sachse to Liquidate the Assets in His Account, to Pay the Proceeds Thereof to Donelson in Cash and Sachse Purports to Do So and, Once Again, Claims That the Check Representing Those Proceeds is "Lost" by "UPS"**

49.     On a date well known by Ameriprise and believed by Donelson to be approximately two weeks after the conversation detailed in the preceding paragraph, Donelson told Sachse by

telephone to have Ameriprise send Donelson a check in the amount of $483,000 which Donelson said he would then use to "restart" or "reopen" his brokerage account at Ameriprise.

50.     In response, Sachse told Donelson that Ameriprise's "internal computer problems" remained unresolved and that closing the account and remitting the $483,000 in account proceeds to Donelson would "take some time."

51.     Approximately two weeks later, Donelson asked Sachse whether the $483,000 check had been sent.  Sachse told Donelson that that check, like the predecessor $40,000 and $30,000 checks had been "sent to Donelson through UPS."

52.     Nevertheless, whether in the year 2015 or thereafter, no $483,000 check or any check in any amount was ever delivered to or received by Donelson, whether by or through "UPS" or otherwise.

53.     At the beginning of the year 2016, Donelson told Sachse that Donelson wished to "get some outside help to get this mess straightened out:"

> a.     In response, Sachse told Donelson that if Donelson were to "get outside help," it would cost Sachse "his job;"
>
> b.     Sachse told Donelson "about his family;"
>
> c.     Sachse told Donelson that if Donelson were to "bring any third party in," it would "hurt" Sachse's "family;"
>
> d.     As a more "family-friendly" alternative, Sachse told Donelson that he would attempt to "get" Donelson "some help" from within Ameriprise itself.

**J.     Sachse Enlists the Help of Another Ameriprise Employee Named "Tryg Nederloe"**

54.     In mid-2016, an Ameriprise employee who identified himself as "Tryg Nederloe" contacted Donelson by telephone and asked whether Donelson had any questions or if there were "any issues" associated with Donelson's account:

      a.      Donelson told "Tryg Nederloe" that there were indeed issues associated with his account and that he had many, many questions;

      b.      "Tryg Nederloe" asked Donelson to send Nederloe copies of Donelson's Ameriprise brokerage statements;

      c.      Donelson told "Tryg Nederloe" that he would do so and informed "Tryg Nederloe" that Donelson had not yet received his checks for $483,000 representing the "cash" in his account as augmented by the $70,000 identified in ¶¶ 42-52 immediately above which had been promised to him by "Ted Brail" of Ameriprise.

55. Approximately one week later, Donelson received a "letter" from "Tryg Nederloe" stating that in fact Donelson's account, identified by the account number which Sachse had given "Tryg Nederloe," contained far less than $483,000, whether in cash or other assets.

56. A week later, in approximately July, 2016, Donelson told Sachse what he had learned from "Tryg Nederloe." Sachse responded by telling Donelson that Nederloe did not know what he was talking about." In reply, Donelson told Sachse that if he did not cause Ameriprise to fix this discrepancy, Donelson would in fact "get" the "outside help" which Donelson had threatened to get.

**K.    Sachse Procures Additional "Help" for Donelson, This Time From Ameriprise "Bean Counter, Ted Trimble" and Ameriprise "In-House Lawyer, Ron Lyle"**

57. Within a week of the conversation with Sachse, as detailed in ¶ 56, in the context of separate phone calls, Donelson was contacted by a "Ron Lyle" and a "Ted Trimble," both of whom said they were employed by Ameriprise:

      a.      Ron Lyle told Donelson that he was "in-house attorney" at Ameriprise;

      b.      Ted Trimble told Donelson that he was "the numbers man" or a "bean counter" at Ameriprise.

58. Both "Ron Lyle" and "Ted Trimble" told Donelson that Ameriprise's "computer system" was "still messed up."

59.     In that same general timeframe and in the context of subsequent telephone calls, "Ted Trimble" told Donelson all of the following:

a.    In response to Donelson's complaint that his account had been "frozen;" that he had been unable to "trade" in the securities that were supposed to be in his Ameriprise account "for a long time;" and that Donelson had never received any of the checks that had been sent to him by "UPS," Trimble told Donelson that he would "put a package together," the purpose of which would be to compensate Donelson for those difficulties;

b.    Trimble told Donelson that he would like to "compensate" Donelson by paying him an additional "$35,000."

60.     After a purported conversation with Sachse, Trimble then told Donelson that he would increase that payment to an "even" $40,000.

61.     Some three weeks elapsed and like the prior, promised checks in the amount of $30,000 and $40,000, the "new check" for $40,000 did not arrive.

62.     "Ted Trimble" began calling Donelson almost daily. During those calls, Trimble apologized profusely for what he described as the "delay" in "sending the checks" to Donelson. In order to compensate Donelson for that delay and the injuries arising from it, "Ted Trimble" and Sachse then made all of the following promises to Donelson:

a.    The promised "checks," two in the amount of $40,000 and one in the amount of $30,000 would be delivered immediately and in fact;

b.    Ameriprise would "pay" to "put" Donelson on its own Blue Cross Coventry health plan and provide him with "insurance cards" evidencing that coverage;

c.    Ameriprise would transfer an additional 40,000 shares in "Prospect Capital, Inc." of which Donelson already held 11,500 shares in his portfolio and an additional 40,000 shares in "Ferrell Gas," certain shares of which Donelson already held in his account.

63.     Thereafter, Donelson spoke by telephone with Sachse, "Ted Trimble" and Ameriprise attorney "Ron Lyle," in the context of separate conversations, and told each of them that he "needed paperwork to confirm all of what" he was to "get" from Ameriprise. All three

17

responded by telling Donelson that these payments/ transactions had to be "coded into Ameriprise's computer system."

64.    By early 2017, Donelson had received no such "paperwork" and upon inquiry was advised by Sachse, Lyle and Trimble that the transactions were "still being coded into Ameriprise's computer system."

65.    Some three weeks later, in February or March, 2017 and still having received nothing from Ameriprise in the way of "paperwork" confirming these transactions, Donelson told Sachse that he wished to speak to Ameriprise's President, Mr. Jim Cracchiolo, and to seek Cracchiolo's help in getting all of these problems resolved.

66.    Apparently, Sachse relayed Donelson's request to "Ted Trimble" since Trimble called Donelson to tell him that Ameriprise's President would not, under any circumstances, "talk to a broker's client."  In response and in separate conversations with each of them, Donelson told Sachse and Trimble that if they did not "have" Cracchiolo "call" Donelson, Donelson himself would "find a way to call" Cracchiolo.

**L.    Ameriprise President Jim Cracchiolo Contacts Donelson and Offers to "Help" by Sending Donelson a "$250,000 Check"**

67.    In mid-2017, Ameriprise President Jim Cracchiolo telephoned Donelson and announced that he was prepared to address Donelson's problems personally.  The following conversation ensued:

a.    Donelson explained the problem of the undelivered checks, the undocumented transfers of securities to Donelson's Ameriprise account, the fact that since 2014, the account had been "frozen" and insusceptible to any trading activity and that the "statements" that Donelson had been receiving from Ameriprise did not reflect the amount of cash and assets which Sachse had told Donelson were in the account;

b.    Donelson informed  Cracchiolo that Sachse, Ted Trimble and Ron Lyle were each "working" on these problems but obviously needed "help" from Cracchiolo;

18

c.    In response, Cracchiolo told Donelson that he would "get all of this taken care of" personally.

68.    Sachse telephoned Donelson later that same day and informed him "confidentially" that Cracchiolo/Ameriprise were going to "offer" Donelson a "$250,000 check" in further compensation for these "problems."

69.    A month expired, however, during which Donelson heard nothing further from Cracchiolo and received none of the "checks" or securities which had been promised to him.

70.    By telephone or in person, Donelson asked Sachse to have Cracchiolo call Donelson. Cracchiolo did so. Donelson asked Cracchiolo why he had not received the promised cash/securities. Cracchiolo told him that everything was still being "coded into the computer" at Ameriprise and that since these transactions were unique, the "coding process" was "taking time."

71.    Two months later, in November, 2017, Donelson still had received nothing. Sachse called Donelson and told him that he, Sachse, had told Cracchiolo that the transaction needed to be concluded or "it might backfire on" Ameriprise. Sachse told Donelson that in order to prevent that from happening, Cracchiolo was going to "give" Donelson a "second check" in the amount of $250,000.

**M.    President Cracchiolo Promises Donelson a Second, Additional Check Also in the Amount of $250,000 and Yet a Third "Check" for $100,000**

72.    A day or two later, Cracchiolo called Donelson and said that since Donelson had had been forced to "wait this extra time," Ameriprise was indeed going to "give" him "another $250,000." In response, Donelson told him again that what Donelson really needed was to have his brokerage account "fixed" in order to "get back into trading" from that account.

73.    Later in the month of November, 2017, Donelson again instructed Sachse to have Cracchiolo call Donelson which Cracchiolo then did. During that call, Donelson asked Cracchiolo when he was to receive the checks that had been promised to him and complained that his

19

brokerage account was still frozen, that the assets depicted therein did not "square" with what Sachse told him that Donelson indeed owned/held and that the brokerage statements still indicated that Sachse was purchasing securities for the account on margin.

74.     In order to assuage these latest complaints, Cracchiolo promised Donelson a further $100,000, once again by "check."

75.     As of the date of the filing of this complaint, no checks have been received, no securities have been transferred and no account statements have been corrected.  Likewise, Donelson's assets continue to be eroded by purchases and sales of securities as well as interest and other costs, fees and expenses associated with "margin trades" which Donelson did not authorize, which he would not authorize and in which, as he told Sachse, even at the inception of the relationship, Ameriprise was never to engage.

### N.     Statements Made to Donelson by Sachse, Ted Trimble and Ameriprise President Jim Cracchiolo in the Context of Recorded Telephone Calls

76.     Commencing in 2018 and upon the actual or approximate dates indicated, Sachse, Ted Trimble and Jim Cracchiolo made each and all of the following statements to Donelson in the context of telephone conversations which were recorded and have been transcribed:

a.     **Donelson's conversations with Sachse on February 22, 2018**:

| Donelson | Hello?  How are you? |
|----------|----------------------|
|          | [*Long silence*] |
|          | [*Ringing*] |
| Sachse   | Yeah.  Hello.  All right.  He [Cracchiolo] is – he is not back until at 4:00.  Time to start calling his secretary.  He's actually in the plane right now, so I left a message.  Um, if you ever talk to Pat, if he tried to call you this morning to tell you what happened.  It was actually good news.  It went through overnight, and I can print the statements out tomorrow.  So…. |
| Donelson | Well, first of all, first of all, you was supposed to be at the store today.  You and I were supposed to be at the store – |
| Sachse   | I tried to call you about five times. |

| | |
|---|---|
| Donelson | Listen. Listen. When are you supposed to meet? Me at the store didn't matter. We didn't need to call. You didn't need to call. You was supposed to meet at the store, because was either gonna get the – the checks or whatever, or the other paperwork. Like you said. You told me that. You told me that. |
| | [Unintelligible] |
| Donelson | You – you see, _____? |
| Sachse | But it – but it went through. |
| Donelson | But, well, you know something, this thing has been going through for a [expletive deleted] week. And nothing's gone through here. Do you understand what I'm saying? Again, you lied to me, Mark. You – I can play the recording back to you. Would you like me to play the [expletive deleted] to ya? |
| Sachse | Yeah. |
| Donelson | Huh? |
| Sachse | Yeah. |
| Donelson | I'm gonna play it back to ya, but it's gonna be in front of a bunch of people, you lying [expletive deleted]. You wanna play games with me? I'm gonna show you games, you [expletive deleted] liar. You are nothin' but a liar and you've done nothing but lie to me, pal. You understand what I just said? You promised it, and you lied again. |
| Sachse | Well, things changed, and I tried to call you. Five times – |
| Donelson | There is nothing that changed! There was nothing that changed, Mark! |
| Sachse | What – |
| Donelson | You told me you would be there. |
| | [Unintelligible] |
| Donelson | You told me you would be there – quit trying to put the blame on somebody else. You failed you. You – you're trying to put the blame on somebody else, when you told me you'll be there one way or the other, Mark. That's what you told me. |
| Sachse | All right. Well…. |
| Donelson | You understand what I'm saying? |
| Sachse | Yeah. Yeah, I do. [Unintelligible] |
| Donelson | Okay. Then why would you lie to me? Why do you con – consistently keep lying, Mark? is my question to you. |
| Sachse | I didn't – uh, they called me this morning and told me the good news, that it had gone through and I can print out the statement tomorrow and [unintelligible]. |
| Donelson | But you were supposed to print out the statement today, bud! It went through yesterday and was supposed to print out the [expletive deleted] statement! I mean, you know, correct me if I'm wrong. Am I right or wrong? |
| Sachse | You – you're wrong, you're – |
| Donelson | No, you're [expletive deleted] wrong, [expletive deleted]! You're the [expletive deleted] liar, and you're wrong! Do you understand this? You [expletive deleted]! |

b. **Conversation between Donelson and "Ted Trimble" on February 22-23, 2018**:

| | |
|---|---|
| Donelson | Hello? |

| | |
|---|---|
| Trimble | Hello, Mr. Donelson? This is Ted [Trimble, Ameriprise's "bean counter"]. I tried to call you earlier this morning just to let you know what was going on. Uh, but everything went through successfully overnight. Uh, statements are gonna go out. They're all going out at different times in the mail, but we'll be able to print it out for you. I thought if we would today, but it'll be able to print it out tomorrow morning. |
| Donelson | Okay. Again, with this – another one of my little scenarios that you guys are used to hearing me say. If this thing is not printed out tomorrow, where do we go? Ted, I'll tell ya what. If it's not printed out tomorrow, I'm gonna – I'm gonna get everybody some help. because I got a feeling we're having problems with this, and I feel that I – I have not done something right with you guys. I feel that I'm being prosecuted by you guys. Does this make sense? I know – |
| Trimble | Wh – |
| Donelson | Wait a minute. I – let me finish. I know you keep telling me, well, this is – and this is done here and this here and this – but I just feel, deep in my heart, I'm feeling very guilty that I have done something wrong. I feel like I have done something wrong to you people. You, Jim and whoever else, and I feel like I'm being prosecuted here for this, as an individual, violate a client. I feel like I've done something wrong, and you know something? I need to have somebody else oversee my stuff. Just to make sure that I'm not doing something wrong! What do you think? |
| Trimble | Well, sir, you haven't done anything wrong here. I don't blame you for feeling that way. I tried to call ya a couple of times before and to explain what was going on, and I guess the first response you said you had a problem with your cell phone, so, at any rate, we're good to go, Paul. So, uh, I apologize. |
| Donelson | I don't know what you mean, we're good to go. What – what's that mean? I've been hearing this good to go for how – how many weeks? I don't know, Wh – I don't understand this. I don't understand "we're good to go." None of that is correct for me, because I'm not seeing anything, Jed. Does that make sense? You know. |
| Trimble | The state – the statement will be – if it's not on the system, it'll be printed out, and it will be tomorrow, and he'll be able to print that out and bring it to ya. Once that – once that's done, everything's done. He can bring everything to you. So – |
| Donelson | What about the 800 number? |
| Trimble | Oh, it'll be on there, too, here in the next day or two because the statements all got mailed out today. |
| Donelson | So, if it got mailed out today, then that means it's on the statement, am I correct in saying that? |
| Trimble | Yeah, it will – it absolutely will be. The latest works is the computer automatically starts sending them out, and then it'll be on our system, uh, the – the – sometimes it's on later in the day, but it'll definitely be on our – our system tomorrow for him to print out. |
| Donelson | Okay, so, it – the statements got sent out. So if my statement's already been sent out, what's it gonna say? |

Case 4:18-cv-01023-BP    Document 1    Filed 12/31/18    Page 22 of 60

| Trimble | Uh, your – your – first of all, when the statements go out, there are probably somewhere around 150,000 that go out. They don't all go out the same day. That's why you rarely – I – I don't know when you get your statement, but you probably rarely get it like the second or the third, you usually get it the fifth or the sixth, or something like that. But it'll reflect all the transactions, so everything will be on there. But you'll have a copy that you can print out tomorrow, and just bring it to you, so you don't have to wait for it to come in the mail. |
|---|---|
| Donelson | Okay, so let me ask you this question here. I know that we've – we've – ha – hashed this out before. Mark Sachse has the $483 – $483,000 check, right? |
| Trimble | He – he – he – he's got – he's got everything that you all have discussed. I don't – I'm not – I don't – I'm not sitting on – in front of me right now, but he's got everything that you all discussed previously. |
| Donelson | Okay. The – the 483, the 400, you was part of that 400, am I correct? |
| Trimble | Yeah. Of course. |
| Donelson | Right or wrong? Am – I mean – |
| Trimble | Well, well, sure. I – I – I don't have all that in front of me right now. I – I'm – I'm – so – you know, he'll have to go over that with ya. But, again, it's all there. It's all – and – and I know everything's gonna be good. |
| Donelson | So, the – the two quarter remains from, mmm, Mr. Cracchiolo? The two checks for $250,000 each. |
| Trimble | Whatever those – yeah, whatever those transactions were, everything will be there. |
| Donelson | Okay. Here's what I need. Here. Since nobody – we don't – none of us needs to know any of this stuff here, I need Jim Cracchiolo to give me a call. Okay? |
| Trimble | Wh – |
| Donelson | Yeah. I – I really do. |
| Trimble | Well, as I think I told you yesterday, he doesn't get back 'til later this afternoon. |
| Donelson | Well, you told me he gets back at noon. Well, noon's – no, noon's already gone by. This is what you told me yesterday. So, noon has gone by, okay? So – |
| Trimble | [*Unintelligible*] Let me – let me just respond. They told me afternoon, I didn't know exactly what time. |
| Donelson | Right. |
| Trimble | I thought it was gonna be right after lunch, but he's not getting back 'til about four or five o'clock. And, frankly, uh, I – I have no idea when he's gonna call, just because of everything that's going on, and – and – and, you know, if there's – there's not gonna be any problems, but he'll call tomorrow if there way. But we'll – we'll have this to you tomorrow. |
| Donelson | I need to know what I have. I need to know what checks I have here coming. See, nobody seems to know anything now. I need to know this. Now, somebody needs to give me a call, or you guys are gonna get a call. I want some answers, Te – Ted! This is all I'm asking. Okay? You – |
| | [*Unintelligible*] |
| Donelson | You've been involved with this whole damn thing. I would just like to know what I have comin' tomorrow! [*Unintelligible*] |
| | [*Unintelligible*] |
| | [*Unintelligible*] |

Case 4:18-cv-01023-BP    Document 1    Filed 12/31/18    Page 23 of 60

| Trimble | I am sitting in my car. I don't have all this memorized. Okay? I tried to call you several times this morning when I was in my office. So, I'll have Mr. Sachse give you a call. |
|---------|--------------------------------------------------------------------------------------------------------------------------------------------|
| Donelson | You do that. |

<br>

      c.     **Conversation between Donelson and Sachse on February 23, 2018**:

| Donelson | Hello? |
|---------|--------|
| Sachse | Did Ted talk to you? |
| Donelson | Yeah, I just got off the phone with him. I'm actually walking into a meeting. Hang on just a second. Let me – let me call you right back. |
| | [*Beeps*] |
| Donelson | Mm-hmm. |
| | [*Beeps*] |
| | [*Ringing*] |
| Donelson | Hello. Hello. |
| Sachse | [*Unintelligible*] it's one o'clock. Yeah, I've got everything we talked about. I've got everything. I'm late for this. I'm – I'm gonna be in here for a couple hours. |
| Donelson | Well, I was asking Ted – |
| | [*Unintelligible*] |
| Donelson | I was asking Ted about this, and he – he seemed to not know anything, uh. |
| Sachse | I don't think he know – I don't he knows anything. |
| Donelson | Well, Mark, let me ask you something I asked him about. |
| | [*Unintelligible*] |
| Donelson | Wait a minute. I asked him about the 483, which he shows. The $483,000 check. I asked him about the 400. Well, I – I don't have it in front of me. You know what, Mark? He had – he's the one that did the deal with the 400,000. How do you not remember that? Am I correct in saying that? |
| Sachse | Yeah. I – I'm – Mark – Mark and his car. I mean, both of us tried to call you three or four times this morning to go through all this, and – and now you're kinda putting him on the spot. I don't – I don't know what – I've got everything, all right? And I'll have it there for you tomorrow. |
| Donelson | Are the – are the two – are the two – is – is the half a million that Cracchiolo's giving me – |
| Sachse | Yeah. |
| Donelson | Is it in two checks or one check? |
| Sachse | Two. |
| Donelson | And that – that – now, the thirty – I get the thirty and the forty, too, am I correct in saying this? |
| Sachse | Exactly. Yeah. I got it all. I got it all. Hey, I – I – I'm late for this guy, I was supposed to be there at one, I gotta get started on it. I apologize. |
| Donelson | All right. |
| Sachse | Yeah. And – uh I'm sorry, I tried to call you. What's wrong with your phone? |

| | |
|---|---|
| Donelson | I don't know. Apparently it's a – a battery issue or whatever. I'm gonna go here in about a couple hours and go and get a battery, and, uh, it'll be – it should be ready to be fired up and ready to go. |
| Sachse | All right. Well, they're – they're – they're telling me we're through tomorrow, but I'm still gonna call you today. Uh, I'll try your cell first, and if you don't pick up, I'll try you at home. |
| Donelson | Yeah. Please do, Mark. I appreciate it. |
| Sachse | Yeah. Okay. Have a good one. |

      d.    **Conversation between Donelson and Sachse on February 26 and 27, 2018**:

| | |
|---|---|
| Donelson | Hello? |
| Sachse | Hey, I'm – I'm still in my afternoon meetings, but I tried your phone, so you haven't gotten it fixed yet? |
| Donelson | Uh, apparently not. I don't know. I don't know if it's the – if it's the battery. I was calling - was talking with a friend of mine, that's kind of an expert on that, and he mentioned that it might be a battery, or it could be something, uh – I didn't drop it, here. |
| | [*Unintelligible*] |
| Donelson | I didn't drop it in the toilet like I did the last one. |
| Sachse | [Laughter] |
| Donelson | Yeah. |
| Donelson | I got me _____. |
| Sachse | Oh, what a shame, man. And it wasn't waterproof. Uh, I'm not sure – hopefully it'll get – hopefully I can go to maybe a T Mobile place here in a little bit or something. I don't know, Mark. I – I don't know what the hell's the problem with it, uh. |
| Sachse | Well – well, here – here's what I'm gonna do, is, hopefully you'll have it working in the morning. But I was gonna call you first thing when I come in, print out the statement, about eight o'clock. Um, and – and if I don't get ya, um, well, I mean, maybe you could [unintelligible] and call me or something? Just so I can let you know that it's done, and, you know, we'll – we'll get this thing done in the morning. |
| Donelson | Yeah. Uh, on the, um, uh, the, uh – Mark, let me ask you this question. Just [clears throat], I'm just being hypothetical. |
| Sachse | Yeah, I know. |
| Donelson | And you know, and I also, too, you know, something, you know. A while ago I was not mad at you, Mark, I'm just upset, Mark, I'm just – |
| Sachse | I – I – I – I get it. |
| Donelson | I'm – I'm upset. And it's not that I'm upset with you. I'm just – |
| Sachse | Yeah. |
| Donelson | Yeah. |
| Sachse | And I get it, and it's unfortunate, 'cause I've been running around all afternoon for these different things, so I'm kinda swamped, but no, I get it, don't worry about it. |
| Donelson | You know, um, but, uh, what – what was you – what was it? You asked me something. I can't – I'm sorry, I for – |

| Sachse | No, I just – I was just saying that I think we're good to go in the morning, and I'll print that thing out, and I'll call you on your cell. But if you know that, you know, like, it's not working and you get a break? |
| Donelson | Yeah. |
| Sachse | You know, give me a call. |
| Donelson | Well, what time – what time are you gonna go into the office? |
| Sachse | I'm – I should be in here no later than 8:30, probably closer to 8:00. But I'll get in here between 8:00 and 8:30. |
| Donelson | Mmkay. Call me then, and I'll holler at you about – about 8:30? Or you call me at 8:30. One of us – one of us – |
| Sachse | Okay. |
| Donelson | Will connect. |
| Sachse | Perfect. |
| Donelson | And, uh – did you – did you? |
| Sachse | _____ tomorrow a better day. |
| Donelson | Did you – yeah, I think so. Did you, uh, did you talk to Ted? I mean, did you have a good talk with him, said, Ted, you know, did we…? |
| Sachse | Yeah. I mean, he – yeah, he explained it. He and I talked a bunch this morning, and the – your phone was out when we'd try and call you, but, yeah. He just – it – it went through overnight, it's just – it – the – the damn system determines when it actually generates a statement. But he – he actually called me, happy that it had gone through. Uh, so, anyway. |
| Donelson | See, if they don't – you know what? It – to me, that statement you just made, it almost sounds to me like he was a little gunshy too, Mark. |
| Sachse | Yeah, he was wor – well, we were all worried. |
| Donelson | Yeah. Yeah. I know. |
| Sachse | Anyway, I gotta run into this next one, but I'll just give you a buzz, you know, like I said, no later than 8:30 in the morning. |
| Donelson | All right, Mark. Thanks, man. |

e. **Conversation between Donelson and Cracchiolo on February 27, 2018**:

| Donelson | Hello? |
| Cracchiolo | Um, oh, you've called from – this is Jim [Cracchiolo], I've been talking with Mr. Sachse, trying to call you on your other number. But I'm gonna be in a meeting soon, and so I wanted to give you a quick call. |
| Donelson | Okay. I appreciate you calling me on this number. My – I've been having problems with my cell phone. I missed two or three calls from Ted and Mark yesterday, uh, just, I told 'em, I said, I apologize, I don't know what the hell's the matter with this cell phone. I'm – you know. |
| Cracchiolo | Well, ok – well, no problem at all. The – the – the statement's gone, and as soon as it's downloadable, which will be tomorrow, uh, Sachse's gonna print that out and bring it to ya and – and – and bring everything else, the documents, _____ and everything. |

| Donelson | Oooh. Let me ask you – let me ask you something. He has the – just for – just for my own knowing – he's got the 483,000, the 40, the 30, and the 20, am – am I – or 40 and 30. Am I correct? |
|----------|---------|
| Cracchiolo | All of those original ones and then he's got the ones, the – the additional two that I shot him, so everything is good to go. |
| Donelson | Okay. Is that on a – the two that you sent? And I – and I thank you for that. |
| Cracchiolo | No, they're – they're separate. |
| Donelson | Oh. Oh. |
| | [*Unintelligible*] |
| Donelson | Go ahead. |
| Cracchiolo | They're – they're separate. And he's got those, as well. Um, but again, I just wanted to give you a quick call. I apologize. I've got to get into this meeting, and I'm – and I'm glad I was able to catch you before – before – when – when you were available. But yeah. It – it's – we are finally good to go, I talked with Ted this morning, and, uh, it's just a question of when it's on the system, you download it, and all statements are showing. |
| Donelson | If this thing – if – if – if this thing is not on there tomorrow, uh, Jim, what – what – what are we doing? What are we doing? |
| Cracchiolo | You know, if it's not on there tomorrow, what I'm gonna do is I'll have Ted go ahead and print out the beta copy and fax it to Mr. Sachse 'cause it's gone on long enough. |
| | [Laughter] |
| Cracchiolo | We – we – we – we – we – well – it's gonna – it's gonna be there tomorrow. |
| Donelson | Okay. No, and you know what? I – I appreciate you taking the time, I know you're a busy guy, buddy, and I – I – I appreciate you taking the time to call, and I appreciate that. And you know what? The two – the two checks, you know, for a quarter million that you done, I really appreciate that. I just – I don't want you to think I don't appreciate it, it's just this thing's been a grind, and – for all of us, you know. |
| Cracchiolo | Yep. |
| Donelson | Yeah. |
| Cracchiolo | All right, so we'll – let's talk, be in touch with you tomorrow. |
| Donelson | Thank you. |

 

      f.     **Conversation between Donelson and Trimble on February 27, 2018**:

| Donelson | Hello? |
|----------|--------|
| Trimble | Hello, Mr. Donelson. I have to kind of keep my voice down. I – I was in a meeting, and I stepped out in the hall when I saw Mr. Sachse's call. Uh, he called me earlier, and I understood what – what occurred today. I checked into things, and they got the – they input the data for the 800 number too late yesterday afternoon. And I – I don't think Jim really even knows how this works, but it's – it's good to go for tomorrow. |
| Donelson | Mmkay, so it's, uh…. |
| Trimble | It'll be – it'll be in there at midnight. |
| | [Unintelligible] |

| Trimble | Uh, you know, and I checked with when they input it, and it – if – if Jim [Cracchiolo] had told me yesterday the timing, I could've told him it wouldn't be in there 'til tomorrow, but, you know, they don't know the – they don't know how the – the technological stuff works, so. We – we are – it's – it's good, and – and he's already told Mr. Sachse to get with you in the morning. |
|---------|---------|
| Donelson | Okay, Tim, I appreciate it very much, buddy. Thank you so much for calling. |
| Trimble | No problem. |
| Donelson | Thank you, sir. |
| Trimble | Sure. |

g. **Conversation between Donelson and Sachse on February 28, 2018**:

| Donelson | Hello? |
|---------|---------|
| Sachse | Okay, I'm gonna try and – I don't know who I'm calling, but I'm gonna try to call some people. I – I – I don't know what to do, but you've told me you want me to talk to someone, I don't know who the hell I'm gonna do – |
| Donelson | I want – I want – I want one – I want one of the board – board of directors to give me a call. |
| Sachse | But they're not gonna – they're not gonna – they're gonna _____. They're not back 'til Monday. |
| Donelson | Well, but you know what? Here's what they'll do. They'll probably call him and say, "Hey, what's going on there?" And you know something? |
| | [Unintelligible] |
| Donelson | I'm not sure – listen, I'm not sure Jim Cracchiolo only has discussed this with the board people like he said he has. But you know what? I think that if we push the issue, and I believe we need to push the issue because, Mark, I'm gonna be honest with you, I cannot see anything here, and – |
| | [Unintelligible] |
| Donelson | What I'm hearing is not good. Mark. You – you – you – you [laughs]. Only thing you care about is your own fucking job right now. That's all you're concerned about. |
| | [Unintelligible] |
| Donelson | And you know what I'm concerned about? Is my fucking money. My shares, my stock, and everything that's been appropriated from my account by you. Do you understand what I'm saying? |
| Sachse | _____ appropriated – |
| Donelson | It's been appropriated, because I do not have it. I – they will not give it to me. I'm gonna tell you right now. They will not give it to me. And this is what it's all about. I don't care what the problem is, that's on them, Mark. Okay? I'm trying to open your eyes. I'm not mad at you. I'm trying to open your fucking eyes so you'll see this thing, Mark. You're not seeing it. You're not helping me, Mark. You're hurting me, Mark. You are hurting me. Do you understand what that is? |
| Sachse | Will you let me answer you? You've asked me to do these calls. I'm gonna try and figure out what I can do. So let me make the calls, and I'll call you back. |

h. **Conversation between Donelson and Sachse on February 28, 2018**:

| Donelson | Hello. Hello. Hello. Hello. |
| | [*Beeps*] |
| | [*Ringing*] |
| Sachse | Hey, I left a message for Jim [Cracchiolo] with his secretary, and she told me she'd have him call me. He's – he's on vacation, but this'll probably get me _____. He's gonna call me back at noon, so then after I talk to him, I'll tell him what you said. |
| Donelson | Just tell him – just tell him I'd like to talk with him, because, uh, you know, he's – he's made too many promises, and this thing was done – all – everything was done, it was on the 800 number, it was all done – |
| Sachse | Yes, I – I – I know the story. |
| Donelson | Yeah. Right. Right. Well, then, you can either bring the story to him and – and open his eyes up, okay? |
| Sachse | Okay. |

i. **Conversation between Donelson and Cracchiolo on March 1, 2018**:

| Donelson | Hello? |
| | [*Unintelligible*] |
| Cracchiolo | How are you? |
| Cracchiolo | [*Unintelligible*] Why aren't you where you get on a plane so I wanted to get on a plane so I wanted to give you a quick call. Well, we finally got everything resolved, uh, earlier, actually been resolved on Friday. We were – we were good to go, and I understand he he's gonna get with you tomorrow. I know he's under the weather today, but he told me he's back in the office tomorrow, so he's got everything he needs here. We're done and ready to go. |
| Donelson | Okay. I appreciate it very much, Jim. |
| Cracchiolo | Okay. And – and I'll look forward to talking to you after all this is over. |
| Donelson | Okay. Thank you. |
| Cracchiolo | Mr. Donelson, thank you. |
| Cracchiolo | Bye-bye. |

O. **Ameriprise Terminates Sachse's Employment as an Ameriprise "Broker-Dealer" and "Investment Advisor" on Grounds That He Had Provided "Misleading Information to One of His Clients" and, Allegedly, Had Impersonated "Home Office Personnel"**

77. On March 5, 2018, Donelson informed Ameriprise in writing, through counsel, of

the facts, circumstances, transactions and occurrences identified hereinabove and demanded that

Ameriprise immediately pay and transfer to him all of the cash and securities which he had been promised by Sachse, Trimble, Lyle and Cracchiolo.

78.     By letter to Donelson dated March 28, 2018, Ameriprise responded to Donelson. In that letter, Ameriprise informed Donelson of each of the following;

      a.    "**Mark Sachse is no longer associated with Ameriprise Financial**;"

      b.    Ameriprise "**terminated**" its "**association with Mr. Sachse on March 22, 2018**;"

      c.    Ameriprise did so "**after it concluded that Mr. Sachse violated company policy, specifically the firm's code of conduct**;"

      d.    According to Ameriprise's letter, Sachse's violations of Ameriprise's "**code of conduct**" included Sachse's "**impersonation of home office personnel and providing misleading information to one of his clients**."

79.     These statements notwithstanding, Ameriprise declined to pay or offer to pay anything to Donelson or otherwise to compensate him in any way but, on the contrary, suggested that Sachse had "done pretty well" as Donelson's broker-dealer and financial/investment advisor.

    **P.**    **Sachse, Cracchiolo and Ameriprise Engaged in the Transactions and Made Each of the False and Fraudulent Promises and Representations Identified Hereinabove in Order to Conceal Their Fraudulent Manipulation of and Misdealings in Donelson's Securities, Money and Property and Their Consequent Breaches of Their Fiduciary and Other Duties to Donelson**

80.     A copy of Donelson's consolidated Ameriprise brokerage/investment account "statement" for the period of January 1, 2010 through and including December 31, 2010 is attached to this Complaint as **EXHIBIT 1** and by reference incorporated herein.

81.     On September 2, 2010, cash and securities having a total aggregate value of $116,216.70 were transferred from Donelson's brokerage/investment account at Baird to Donelson's "new" brokerage/investment at Ameriprise.   Those assets were comprised of the following:

a.  7,500 shares in General Electric Co. having a then having an aggregate market value of $113,625.00;

b.  $2,466.70 in cash;

c.  $125.00 in "EAR fee rebates."

82. None of the cash and none of which Donelson's securities had been transferred from Baird to Ameriprise had been purchased, or represented the proceeds of securities which had been purchased, on "margin" and none were encumbered by any liens, obligations or "margin" indebtedness.

83. On December 20, 2010, Sachse/Ameriprise recorded the "receipt" into Donelson's account of 100,000 shares of an entity called "VDO-Ph International:"

a.  None of those shares were securities registered with the SEC;

b.  None are traded or are tradable on any national exchange;

c.  All were offered to the public, including Donelson, under a purported exemption from registration which restricted the sale thereof to "accredited investors," as that term is defined by the SEC.

84. A copy of Donelson's "consolidated" Ameriprise brokerage/investment account statement for the period January 1, 2011 through and including December 31, 2011 is attached to this Complaint as **EXHIBIT 2** and by reference incorporated herein.

85. Donelson began the year 2011 with $147,095.59 in cash and securities in his Ameriprise brokerage/investment account.

86. None of the securities held in Donelson's Ameriprise brokerage/investment account had been purchased on "margin" and none of the cash and assets contained in the account were encumbered by any liens, obligations or indebtedness of any kind.

87. On July 7, 2011, Sachse/Ameriprise caused the sale by/from Donelson's brokerage/investment account of 7,661.24 shares of General Electric Co. for the sum of

31

$148,332.00 which sale caused Donelson to suffer short term losses in the amount of $99.00 and long term losses in the amount of $24,922.84.

88. On July 7, 2011, Sachse/Ameriprise caused the purchase by Donelson's brokerage/ investment account of 2,300 shares of Cerner Corp. at a price of $64.149 per share for a total of $148,342.41. None of these Cerner shares were purchased "on margin."

89. On October 19, 2011, Sachse purported to record, for the second time, the in-kind "receipt" into Donelson's brokerage account of 100,000 shares in VDO-Ph, the same 100,000 shares which Ameriprise had already recorded as received on December 20, 2010 and, in effect, had now "doubled counted."

90. In the context of this second "counting" of the same securities, Ameriprise asserted and represented to Donelson that these 100,000 VDO-Ph shares had a "cost basis" of but $50,000 but a value, as received, of fully $60,000.

91. In addition, Ameriprise booked/recorded the receipt into Donelson's brokerage account, in-kind, of a further 300,000 shares in VDO-Ph to which Ameriprise ascribed a value of $219,000.

92. During the year 2011, Ameriprise sold securities from Donelson's account totaling $148,382 in value and purchased securities totaling $148,342 in value.

93. All from a brokerage/investment account:

   a. That a beginning value, at the inception of 2011, of but $147,095;

   b. That had an ending value of $194,813 after losses in the value of securities held in the account of $12,281.96;

   c. That had increased in value only as the result of the "receipt" in 2011 of "$60,000" in VDO-Ph shares, a transaction had, in effect, been already recorded in 2010 and thus had been "double booked."

94.     A copy of Donelson's "consolidated" Ameriprise brokerage/investment account statement for period January 1, 2012 through and including December 31, 2012 is attached to this Complaint as **EXHIBIT 3** and by reference incorporated herein.

95.     Donelson began the year 2012 with cash and securities in his Ameriprise brokerage/ investment account totaling $194,813.63.

96.     None of the securities held in the account had been purchased on "margin" and none of the cash and assets contained therein were encumbered by any liens, obligations or "margin" indebtedness of any kind.

97.     On February 8, 2012, Ameriprise sold all of the Cerner shares which it had acquired for Donelson's account in July, 2011.  100 shares were sold at a price of $70.53 per share and the remaining 2,200 shares were sold at the price of $70.54 per share.

98.     This resulted in a short-term gain of $13,005.77, all upon securities that Donelson had purchased as and intended to hold as long-term investments and as a means of funding his eventual retirement.

99.     In April, 2012, Donelson deposited an additional $129,500 in his Ameriprise brokerage account.

100.    In April, 2012, Ameriprise caused Donelson's account to purchase 20,000 units of Ferrell Gas Partners, LP in the following increments:

    a.      10,000 units purchased on April 2, 2012 at a price of $14.98 per unit for a total of $150,806.00;

    b.      5,000 units purchased on April 3, 2012 at a price of $14.94 per unit for a total of $75,260.00;

    c.      5,000 units purchased on April 16, 2012 at a price of $13.50 per unit for a total of $68,006.00.

101. Donelson's express instructions notwithstanding, all of these Ferrell Gas units were purchased on margin.

102. On June 27, 2012, Ameriprise caused Donelson's account to purchase 15,000 shares of Armor Residential REIT, Inc. at a price of $7.03 per share for a total of $106,742.88.

103. Donelson's express instructions notwithstanding, all of these Armor Residential shares were purchased on margin.

104. On July 9, 2012, Ameriprise caused Donelson's account to sell the 15,000 Armor Residential shares which they had acquired for Donelson less than two weeks earlier for a purported gain of $.43 per share.

105. On July 20, 2012, Ameriprise caused Donelson's account to purchase a further 25,000 shares of Armor Residential at a price of $7.39 per share for a total of $187,364.52.

106. On September 14, 2012, Ameriprise caused Donelson's account to sell those same 25,000 shares of Armor Residential, as purchased barely 45 days earlier, for $7.57 per share or a total of $188,839.76.

107. Having sold 25,000 such shares in September, 2012, on October 10, 2012, Ameriprise caused Donelson's account to purchase 30,000 "new" shares of Armor Residential at a price of $7.50 per share for a total of $226,506.00.

108. In the space of six months, Ameriprise caused Donelson's account to purchase fully 70,000 shares of Armor Residential and in that same period to sell 40,000 of such shares, all in the pursuit of "gains" in share value of less than $.15 per share.

109. During the year 2012:

   a.    Ameriprise caused Donelson's brokerage account to purchase $814,639.40 in securities;

   b.    $446,850.00 of those were purchased and held on "margin;"

34

c. Ameriprise sold $568,535.99 in securities from Donelson's brokerage account.

110. Donelson ended the year 2012 with total assets in his account of $462,850.

111. Of that number, $228,858.02 were subject to/encumbered by "margin" indebtedness.

112. A copy of the "consolidated statement" of Donelson's Ameriprise brokerage/ investment account for the period January 1, 2013 through and including December 31, 2013 is attached to this Complaint as **EXHIBIT 4** and by reference incorporated herein.

113. Donelson began the year 2013 with cash and securities in his account having a net value of $236,987.03 after consideration of "margin" indebtedness of $228,858.02.

114. According to the "consolidated statement" for the year 2012 that is **EXHIBIT 3**, as of December 31, 2012, Donelson's account held $462,850.00 in "equity" securities before "margin" indebtedness, which securities were comprised of the following:

a. 30,000 shares of Armor Residential having an aggregate value of $194.00 at 12/31/12 prices;

b. 15,000 units of Ferrell Gas having an aggregate value of $252,750 at 12/31/12 prices;

c. 400,000 shares of VDO-Ph having a value of $16,000 at 12/31/12 prices.

115. According to the consolidated Ameriprise account statement that is **EXHIBIT 3**, Ameriprise had caused Donelson's brokerage/investment account to purchase a total of 20,000 "units" of Ferrell Gas in April, 2012.

116. According to the same **EXHIBIT 3**, Ameriprise then caused Donelson's brokerage account to sell 5,000 of those units in August, 2012.

35

117.    According to Donelson's brokerage statements, there were fully 15,000 Ferrell Gas "units" in Donelson's brokerage account on January 21, 2013, all of which had been purchased on "margin", Donelson's instructions to the contrary notwithstanding.

118.    According to the consolidated brokerage statement for the year 2013 that is **EXHIBIT 4**, Ameriprise caused Donelson's brokerage/investment account to sell all 15,000 of these Ferrell Gas units on May 8, 2013 at prices ranging from $20.05 per unit to $20.13 per unit.

119.    On June 20, 2013, Ameriprise caused Donelson's brokerage account which had a beginning value of cash and securities of only $236,987.03 to purchase 3,000 shares of Cerner Corp. at a price of $94.51 per share for a total of $285,063.03.

120.    Despite Donelson's instructions to the contrary, those Cerner shares were purchased by Ameriprise on margin.

121.    The remaining 30,000 shares of Armor Residential which Ameriprise had caused Donelson's brokerage account to purchase in June and July, 2012 paid cash dividends to Donelson of $2,100 per month in the months of June, July, August and September, 2013 and of $1,500 per month in the months of October, November and December, 2013.

122.    On or about December 31, 2013, Ameriprise informed Donelson of each and all of the following:

      a.    The 30,000 shares of Armor Residential which Ameriprise had purchased for Donelson's account on October 10, 2012 had been purchased in reliance upon a "tip" which Ameriprise had received from "Merrill Lynch," another broker-dealer;

      b.    According to Ameriprise, this had proven to be a "bad tip" since the price of Armor Residential shares had subsequently declined;

      c.    Sachse informed Donelson that "Merrill Lynch" itself recognized that it had given Sachse a "bad tip" and, accordingly, that "Merrill Lynch" intended to "compensate" Ameriprise's customers for whatever losses they sustained in reliance upon that "bad tip;"

> d.  Specifically, "Merrill Lynch" had advised Sachse that his Ameriprise customers should "sell" their shares in Armor Residential, immediately, whereupon "Merrill Lynch" would "compensate them" in cash for their losses on that security;
>
> e.  Ameriprise told Donelson that since he was likely to suffer a loss on the sale of the Armor Residential shares of at least $100,000, the end of 2012 "would be a good time" to sell all of the Cerner shares in his portfolio just as Sachse had sold the Ferrell Gas shares in Donelson's portfolio earlier in 2012;
>
> f.  Although the sales of those shares would produce capital gains, taxable as such, those capital gains could/would be offset for purposes of 2012 income taxation by "the losses" which he would suffer upon selling the Armor Residential shares.

123.   In reliance upon these representations, all of which were asserted by Ameriprise to be truthful and accurate but were, in fact, false and deceptive and the expectation that any losses that he would suffer from the sale of the 30,000 Armor Residential shares would be "made up" by tipster "Merrill Lynch," Donelson authorized Ameriprise to sell and liquidate all of his Cerner shares on December 23, 2013 and all of his Armor Residential shares on December 31, 2013, resulting in a loss to Donelson and his brokerage account of fully $107,314.09.

124.   A copy of the "consolidated statement" of Donelson's Ameriprise brokerage/ investment account for the period January 1, 2014 through and including December 31, 2014 is attached to this Complaint as **EXHIBIT 5** and by reference incorporated herein.

125.   Donelson began the year 2014 with $238,574.08 in cash or its equivalent and $8,507.75 in equities in his brokerage account, none of which were encumbered by any "margin" indebtedness.

126.   A copy of the "consolidated statement" of Donelson's Ameriprise brokerage account for the period of January 1, 2015 through and including December 31, 2015 is attached to this Complaint as **EXHIBIT 6** and by reference incorporated herein.

127.    Donelson began the year 2015 with $247,081.83 in cash and securities in his account, none of which was encumbered by any "margin" indebtedness.

128.    On April 22, 2015, Ameriprise remitted a check to Donelson in the amount of $40,000 on which date Sachse/Ameriprise informed Donelson that such $40,000 represented part of the $70,000 which Ameriprise/Sachse had promised to pay to Donelson for the "problems" associated with his brokerage account.

129.    In truth and in fact, such $40,000 check represented nothing more, nor less, than a liquidation of the existing investment capital in Donelson's account, the effect of which was to deplete capital and assets which Donelson had intended, at all times, to hold long term for appreciation and for eventual use upon his retirement.  In effect, Ameriprise purported to "compensate" Donelson with Donelson's own money.

130.    On May 5, 2015, Ameriprise remitted two additional checks to Donelson, each in the amount of $7,500 which, as Sachse informed Donelson, once again represented "dividends" upon securities held in Donelson's brokerage account but which were, in truth and in fact, represented a further liquidation and consequent depletion of his investment capital.

131.    On April 21, 2015, Ameriprise caused Donelson's brokerage account to purchase a "Vanguard Short Term Bond ETF" at a cost of $104,788.14, which purchase was, once again, unauthorized by Donelson and indeed contrary to Ameriprise's representations to Donelson that his account had been and remained "frozen."

132.    On May 7, 2015, Ameriprise caused Donelson's brokerage account to purchase a further "Vanguard Short Term Bond ETF" at a cost of $50,195.88, which purchase was not authorized by Donelson and was not executed pursuant to any instruction given by Donelson to Ameriprise.

133. During the year 2015, these "Vanguard Short Term Bond ETF's" lost value in the amount of $1,801.77.

134. A copy of the "consolidated statement" of Donelson's Ameriprise brokerage account for the period of January 1, 2016 through and including December 31, 2016 is attached to this Complaint as **EXHIBIT 7** and by reference incorporated herein.

135. Donelson began the year 2016 with $189,414.67 in cash and securities in his Ameriprise brokerage account. During 2016, Ameriprise caused Donelson's brokerage account to purchase securities totaling $197,580.86 in actual cost and to sell securities held by such brokerage account totaling $154,492.76 in value.

136. On January 15, 2016, Ameriprise caused Donelson's brokerage account to purchase 20,000 shares of "Prospect Capital Corp." at a price of $117,652.86, all of which were purchased on "margin," Donelson's instructions to the contrary notwithstanding.

137. On March 17, 2016, Ameriprise caused Donelson's brokerage account to purchase a further 11,200 shares of Prospect Capital at a price of $79,888.00, all of which were, once again, purchased on "margin," Donelson's instructions to the contrary notwithstanding.

138. On March 17, 2016, Ameriprise caused Donelson's brokerage account to sell all of the Vanguard Short Term Bond ETF securities which Ameriprise had caused Donelson's brokerage account to purchase in 2015, which sale resulted in a further loss to Donelson's brokerage account of $481.26.

139. Having been informed that his account was and remained "frozen," Donelson did not authorize any of those purchases, or any of those sales of securities.

140.    On February 11, 2016, Ameriprise remitted a check to Donelson in the amount of $10,000 on which date Ameriprise informed Donelson that such $10,000 represented a "dividend" which Donelson had received from "Ferrell Gas stock" allegedly held in his brokerage account.

141.    On February 25, 2016 and again on April 11, 2016, Ameriprise remitted two additional checks to Donelson, the first in the amount of $20,000 and the second in the amount of $20,400 on which dates Ameriprise again informed Donelson that such checks represented "dividends" which Donelson had received from "Ferrell Gas stock" allegedly held in his brokerage account.

142.    In truth, Ameriprise had long since liquidated Donelson's Ferrell Gas holdings and the checks identified in ¶¶ 140-141 totaling $50,000 represented nothing more, nor less, than a further liquidation of the existing investment capital held in Donelson's account, the effect of which was to deplete capital assets which Donelson had intended, at all times, to hold long-term for appreciation and for eventual use upon his retirement.

143.    A copy of the "consolidated statement" of Donelson's Ameriprise brokerage account for the period of January 1, 2017 through and including December 31, 2017 is attached to this Complaint as **EXHIBIT 8** and by reference incorporated herein.

144.    Donelson began the year 2017 with $193,019.85 in his investment account consisting, principally, of 31,200 shares of Prospect Capital, all of which were encumbered by a margin obligation in the amount of $74,557.70.

145.    Donelson ended the year 2017 with securities in his brokerage account having a value of $211,065.62, all of which were encumbered by margin obligations in the amount of $74,557.70, leaving him with net assets in the account valued at only $136,507.92.

146.    That, despite the fact that:

a.    Donelson began the year 2014 with $254,350.62 in cash and securities in his brokerage account, none of which were encumbered by any "margin" indebtedness;

b.    Donelson began the year 2015 with $247,081.83 in cash and securities in his brokerage account, none of which were encumbered by any "margin" indebtedness;

c.    None of the securities or purchases of securities which Ameriprise had caused Donelson's account to purchase from and after January 1, 2014 had been authorized and approved by Donelson;

d.    None of the securities or purchases of securities which Ameriprise had caused Donelson's account to purchase on "margin" from and after January 1, 2014 had been authorized by Donelson;

e.    None of Ameriprise's sales and liquidations of the cash and securities representing the investment capital held in Donelson's brokerage account subsequent to January 1, 2014 had been authorized by Donelson.

## ADDITIONAL SCIENTER ALLEGATIONS

147.   The following facts, as alleged hereinabove, give rise to a strong inference that Ameriprise Defendants acted with a mental state embracing an actual intent to deceive, manipulate or defraud Donelson and all others similarly situated within the meaning of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  Such inferences are both cogent and compelling and/or at least as compelling as any plausible, opposing inference that could be drawn from the same facts and are, in addition, evidence of a fraudulent plan or scheme on the part of Ameriprise and its agents, including "Associate Vice President" Sachse and "Chairman and CEO" Cracchiolo to dissuade, hinder or delay Donelson from or in the pursuit of the claims herein asserted against these and all other Defendants:

a.    As demonstrated in ¶¶ 25 and 27 hereinabove, Sachse informed Donelson that Donelson would not have to trade securities on margin; that Sachse understood Donelson's instruction that no trades were to be accomplished on margin; and that in fact, no securities would be acquired for Donelson's brokerage account on margin when, in truth and in fact and as demonstrated in ¶¶ 100, 101, 109, 114, 119, 120, 137-138.  Nevertheless, Ameriprise purchased $446,850 in securities for Donelson's account on margin in the

41

year 2012; $285,063 in securities on margin for Donelson's account in the year 2013; and $197,540 in securities on margin for Donelson's account in the year 2016;

b. As demonstrated in ¶¶ 33-36, 43-44 and 75 hereinabove, Ameriprise employee "Ted Brail" as well as Ameriprise "Associate Vice President" Sachse each represented to Donelson that he would receive two checks from Ameriprise totaling $70,000 in compensation for the "problems" associated with Donelson's brokerage account, including the unauthorized purchase of securities for the account "on margin" when in truth and in fact, such checks were not received by Donelson, whether in November or December, 2014, January, 2015 or thereafter and no such checks were ever issued and made payable by Ameriprise to Donelson;

c. As demonstrated in ¶¶ 38-44 and 75 hereinabove, Sachse informed Donelson that checks totaling $70,000 had in fact been issued by Ameriprise and although they had been sent to Donelson by "UPS delivery," the delivery thereof to Donelson, in fact, had "been messed up by UPS" when in truth and in fact, such checks were not received by Donelson, whether in November or December, 2014, January, 2015 or thereafter and no such checks were ever issued and made payable by Ameriprise to Donelson;

d. As demonstrated in ¶ 43 and 75 hereinabove, Sachse informed Donelson that he had visited "a UPS facility in Johnson County, Kansas" in order to "pick up" the two checks totaling $70,000 which allegedly had been consigned to UPS for delivery, and then to deliver them personally to Donelson but was informed that the checks had already been "loaded on a UPS truck" for "delivery" to Donelson when in truth and in fact no such checks had ever been consigned to UPS for delivery and no such checks had ever been "loaded" on any UPS vehicle for delivery to Donelson, and no such checks were ever delivered to or received by Donelson;

e. As demonstrated in ¶¶ 44-48 hereinabove, Sachse informed Donelson that Donelson's brokerage "account statements" were "messed up;" that although these "paper statements" showed that Donelson had only $250,000 in assets in his brokerage account, Sachse, who claimed to be "looking" at Donelson's account as depicted on Sachse's own computer assured and represented to Donelson that his account contained fully $483,000 in cash, and that Donelson should "disregard" whatever was shown on his "paper" account statements, when in truth and in fact, Donelson's brokerage account contained far less than the $483,000 in cash which Sachse represented the account to contain;

f. As demonstrated in ¶¶ 49-52 and 75 hereinabove, when Donelson requested that Ameriprise send him a check in the amount of $483,000 representing the entirety of the assets which, according to Sachse, were contained in

Donelson's brokerage account, Sachse represented to Donelson falsely that Ameriprise would in fact do so and had in fact remitted a check in the amount of $483,000 to Donelson "through UPS" when in truth and in fact, no such check was ever remitted or made payable to Donelson by Ameriprise; no such check was consigned by Ameriprise to UPS or any other carrier for delivery to Donelson, and no such checks were ever delivered to or received by Donelson;

g.    As demonstrated in ¶¶ 57-66 and 75 hereinabove, Donelson was informed by Ameriprise "in-house attorney" Ron Lyle and Ameriprise "bean counter" Ted Trimble that Ameriprise's computer system remained "messed up" and that in compensation for the damage occasioned to Donelson as a result of such "messed up" computer system, Ameriprise would remit a further check in the amount of $40,000 in addition to the two checks totaling $70,000 that had been promised earlier, when in truth and in fact, no such additional check in the amount of $40,000 was ever remitted or made payable by Ameriprise to Donelson; that the said "Ron Lyle" and "Ted Trimble" were either fictitious persons, the identity of whom was manufactured and created by Sachse and Ameriprise in order to deceive and defraud Donelson or, in the alternative, were actual, serving bona fide Ameriprise employees who had been deployed and instructed to obscure or conceal Ameriprise's fraudulent, deceptive and/or manipulative conduct with respect to Donelson or to dissuade, hinder or delay Donelson from or in the pursuit of claims arising out of such fraudulent, deceptive and/or manipulative conduct;

h.    As demonstrated in ¶¶ 62 and 75 hereinabove, Ameriprise bean counter "Ted Trimble" and Ameriprise "Associate Vice President" Sachse not only promised Donelson what were, at that juncture, three checks totaling $111,000 but promised to transfer an additional 40,000 shares of Prospect Capital and an additional 40,000 shares of Ferrell Gas to Donelson's account when in truth and in fact, no such additional shares were ever deposited in or credited to Donelson's brokerage account;

i.    As demonstrated in ¶¶ 67-71 hereinabove, "Ameriprise Chairman and CEO" Cracchiolo himself promised that Ameriprise would "give" Donelson two further checks in addition to the three checks already promised, each in the amount of $250,000 as soon as those checks could be "coded into" Ameriprise's computer when in truth and in fact, no such checks were ever issued or made payable by Ameriprise to Donelson and such statements were made by CEO Cracchiolo merely to conceal the fraudulent, deceptive and/or manipulative conduct identified in the Complaint and otherwise to dissuade, hinder or delay Donelson from or in the pursuit of claims against Ameriprise;

j.    As demonstrated in ¶¶ 72-75 hereinabove, Ameriprise CEO Cracchiolo promised Donelson yet a sixth check in the amount of $100,000 to

43

compensate for the "delay," presumably in "coding" these payments "into" Ameriprise's computer system, once again to conceal the fraudulent, deceptive and/or manipulative conduct identified with particularity above and/or to dissuade, hinder or delay Donelson from or in the pursuit arising out of such fraudulent, deceptive and/or manipulative conduct against Ameriprise;

k.    As demonstrated in ¶¶ 83, 89, 90-91 hereinabove, Ameriprise made the false, fraudulent and deceptive promises and statements and engaged in the deceptive and manipulative conduct identified in ¶¶ 25, 27, 30-43, 75, 92-93, 97, 100, 102, 104-110, 114, 116, 118-119, 121, 129, 137-138, 140 and 145-146 hereinabove in order to conceal its "double counting" of the same securities as assets of Donelson's brokerage account and to further enhance the value of the account through the purported receipt of unregistered shares in "VDO-BH" which were not traded on any national exchange and which should not have been sold to Donelson since he was not an accredited investor and which were, at all times, worthless;

l.    Ameriprise made the false and fraudulent statements and promises and engaged in the fraudulent, deceptive and/or manipulative conduct detailed in ¶¶ 25, 27, 30-36, 38-39, 43, 75, 92-93, 97, 100, 102, 104-110, 114, 116, 118-119, 121, 129, 137-138, 140 and 145-146 hereinabove in order to conceal Ameriprise's excessive, improper and unlawful buying and selling of securities in Donelson's brokerage account of a kind, type and with a level of frequency that was inappropriate, unjustified and injurious, given Donelson's financial resources and his investment objectives and were transactions which Ameriprise and Sachse consummated for no other purpose and to generate greater profits for themselves;

m.    Ameriprise made the false statements and promises and engaged in the fraudulent, deceptive and/or manipulative conduct detailed in ¶¶ 25, 27, 30-36, 38-43, 75, 92-93, 97, 100, 102, 104-110, 114, 116, 118-119, 121, 129, 137-138, 140 and 145-146 hereinabove in order to conceal the fraudulent, deceptive and/or manipulative conduct arising out of Ameriprise's statements to Donelson to the effect that the Armor Residential shares which had been purchased for his account had been purchased in reliance upon a "bad tip" received from Merrill Lynch; that Merrill Lynch intended to "compensate" Ameriprise's customers for whatever losses they had sustained in reliance upon that "bad tip;" and that in anticipation of the receipt of such compensation, Donelson should show his Ameriprise shares at a loss exceeding $100,000 and sell all of the shares in his brokerage account which had appreciated in value in order to offset those "gains" with the losses that would be incurred upon the sale of the Armor Residential shares, all as detailed in ¶¶ 122-123 of the Complaint;

n.    Ameriprise made the false and fraudulent statements and promises and engaged in the fraudulent, deceptive and/or manipulative conduct identified

in ¶¶ 25, 27, 33-36, 38-43, 75, 92-93, 97, 100-101, 109, 114, 119-120, 137-138, 140 and 145-146 hereinabove in order to conceal its fraudulent, deceptive and/or manipulative conduct associated with the fact, as detailed in ¶¶ 130-132 and 142-144, Ameriprise distributed a total of $115,000 to Donelson either as "payment" of at least $40,000 in compensation for the "problems" associated with Donelson's account as "dividends received" upon "Ferrell Gas" and other securities held in Donelson's account but which were in truth and in fact, liquidations of capital assets held in the account which Donelson had intended, at all times, to hold long-term in the hope of appreciation and eventual use upon his retirement.

148. Ameriprise, Sachse, Cracchiolo and all other Defendants acted with scienter in that they are each charged with knowledge that as provided under Dodd-Frank, § 913(g), 15 U.S.C. § 78o(k)(1), they were required to act in Donelson's best interests when providing personalized investment advice about securities to him and to other retail customers similarly situated, without regard to their own financial or other interest, which standard was equivalent, in all respects, to that established under §§ 206(1) and 206(2) of the Investment Advisors Act, 15 U.S.C. § 80b-11(g)(1) and yet made the false and fraudulent and/or deceptive representations and/or in breach of that duty and engaged in the transactions and conduct described with particularity in ¶¶ 25, 27, 33-36, 38-43, 75, 92-93, 97, 100-101, 109, 114, 119-120, 137-138, 140 and 145-147 hereinabove.

149. Ameriprise, Sachse, Cracchiolo and all other Defendants acted with scienter in that they are each charged with the knowledge that they owed, at all times and in every context involving the purchase or sale of a security by or for Donelson's brokerage account, a fiduciary duty requiring the faithful execution and satisfaction of, *inter alia*, the following duties and obligations:

    a.    A duty of loyalty which required them, at all times, to act in the best interest of Donelson by recommending only investments suitable for Donelson based on an appropriate understanding of Donelson's circumstances, goals and risk tolerance and at all times placing Donelson's interests above their own;

b.      A duty to avoid conflicts of interest or if not avoided altogether, obtaining Donelson's informed consent to such conflicts after full, complete and frank disclosure;

c.      A duty of obedience which required them to, among other things, following and adhering to instructions or guidelines issuing from Donelson concerning impermissible investments or such things as the purchase of securities "on margin;"

d.      A duty to act in good faith which required them, at all times, to act with honesty and candor toward Donelson and truthfulness and accuracy in all communications and disclosures with and to Donelson;

e.      A duty of disclosure which required the full and fair disclosure by them to Donelson of all facts material to each and every transaction involving his brokerage account;

f.      A duty to conduct due diligence with respect to and to faithfully supervise associate broker-dealers/advisors such as "Associate Vice President" Sachse.

150.    Ameriprise, Sachse and each of the Ameriprise Defendants acted with scienter in that they are charged with knowledge of FINRA Rule 2111, which provides, in relevant part, that:

(a)  A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

151.    Ameriprise Defendants further acted with scienter in that they knew that the statements made to Donelson and the other members of the Class to induce them to agree to or to otherwise cause them, without actual knowledge or reasonably informed consent. to participate in or become affected by the transactions identified and described with particularity in ¶¶ 25, 27, 33-36, 38-52, 57-75, 83, 89-91, 100-101, 109, 114, 119-120, 137-138, 140 and 145-147 hereinabove were false, misleading and omitted material information; that Ameriprise Defendants knew that

46

Donelson and the other members of the Class were relying wholly upon the expertise of Ameriprise Defendants, yet they betrayed that trust to benefit financially at the expense of Donelson and the other members of the Class.

152. Ameriprise Defendants were highly motivated to make, suffer, allow and facilitate the statements, acts, omissions and conduct in the preceding paragraphs since, in exchange for engaging in and allowing such false and fraudulent, deceptive and manipulative acts and conduct alleged herein, Ameriprise and Ameriprise Defendants received increased financial compensation in the form of annual fees, costs and commissions.

## CLASS ACTION ALLEGATIONS

153. Donelson brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class consisting of all persons, excluding only Ameriprise Defendants, Ameriprise's own officers and directors and all members of their respective families and their legal representatives, heirs, successors or assigns who, during the five (5) year next-preceding the date of filing of this action to whom, or in respect of whom, Ameriprise Defendants, whether by or through, or as a consequence of the agency of Ameriprise Associate Vice President Sachse or otherwise:

  a.  Made false, misleading and/or deceptive statements and/or failed to disclose material information to Donelson and other similarly situated investors ("Other Investors") with the intent and for the purpose of inducing them to open, keep or maintain "brokerage" and/or "advisory" accounts at Ameriprise and in the context of those accounts, to place substantial sums of money within the management, direction and control of Ameriprise;

  b.  Disregarded the investment objectives of Investors with respect to the substantial sums which they invested with or otherwise entrusted to Ameriprise;

  c.  Executed securities transactions that were unauthorized by or otherwise unsuitable for such Investors, all for the purpose and with the intent of increasing the fees paid and payable to Sachse and/or Ameriprise by such

customers, or otherwise chargeable against the assets or investments of such Investors;

d.      Breached duties of care with respect to such Investors through frequent and unnecessary trading in disregard of customers' investment objectives and market conditions;

e.      Depleted such investors' investments, as a consequence of trading losses, fees, commissions and other unnecessary and exorbitant charges;

f.      Misrepresented and/or failed to disclose material information to Donelson and Investors regarding the amount of fees, commissions and charges which such customers would become obligated to pay to Ameriprise;

g.      Breached their fiduciary duties to Investors who, like Donelson, were trusting and unsophisticated by "churning" their brokerage accounts through the purchase and/or sale of securities at such time in such quantities with such frequency and/or velocity as to be unnecessary or inappropriate for such Investors given their financial worth, reasonable expectation of return and investment objectives;

h.      Failed to disclose material information or manipulated assets and investments which Investors placed in Ameriprise's control by using such assets to make other self-interested investments, ostensibly on their customers' behalf but of benefit only to Ameriprise;

i.      Caused or permitted defendant Sachse, a person who had been disciplined, censured, suspended and eventually disbarred permanently from the practice of law as a result of his serial breaches of fiduciary duties to his "clients," to become an Ameriprise broker/dealer, investment advisor and/or financial advisor responsible for the care, custody and management of Donelson's investments and the investments of Other Investors;

j.      Failed to properly supervise, manage and direct defendant Sachse in the performance of his duties and responsibilities to Donelson and Other Investors, notwithstanding his prior, repeated and formerly-adjudicated breaches of fiduciary duty;

k.      Made false, misleading and/or fraudulent statements to Donelson and Other Investors to the effect that all losses in value of securities which they had purchased on defendant Sachse's recommendation would be "made up by Merrill Lynch" from whom Sachse had allegedly received the "tip" which he then used to induce Donelson and Other Investors to purchase such securities, originally;

l.      Through the use of false, misleading and/or fraudulent statements, caused or induced Donelson and Other Investors to liquidate all or most of their securities each year or in given years on grounds that "losses" in the value

of securities which defendant Sachse had recommended and purchased for them could be "offset" for tax purposes against the proceeds of other securities which had increased in value, notwithstanding that such performing securities had been acquired by Donelson and Other Investors with the intention that they be used as a source of dividend income and otherwise with the expectation of significant gain long-term rather than for short-term profit;

m.     Disregarded repeated instructions by Donelson and Other Investors that they did not wish to purchase any securities on credit or "margin" and, on the contrary, continued to purchase securities, on margin, for or to the account of Donelson and Other Investors for the single purpose of increasing Ameriprise's income from the interest payments which were then assessed against such investors investment accounts;

n.     Made false, misleading and/or fraudulent statements to Donelson and Other Investors to the effect that Ameriprise had been effecting a "computer change-over" and/or that the "computer system" used to generate the "paper account statements" delivered periodically to Donelson and other customers and that the disruption of its data processing system was the reason or the only reason why the customer account statements of Donelson and Other Investors continued to show transactions "on margin" from which such customers had ordered Ameriprise to abstain;

o.     Falsely, fraudulently and deceptively misrepresented to Donelson and Other Investors that their "accounts at Ameriprise were frozen" as necessary, allegedly, to permit Ameriprise to "correct glitches" in its computer system thus preventing such persons from obtaining or exercising effective access to the cash, securities or other assets in their "Ameriprise accounts" and, *inter alia*, depriving them, for extended periods, the opportunity to use such cash or to trade in such assets or securities;

p.     In the context of false, misleading and/or fraudulent statements made to Donelson and Other Investors by defendant Cracchiolo, defendant Sachse and Ameriprise employees "Ron Lyle," "Ted Brail" and "Ted Trimble," Ameriprise promised and assured Donelson and Other Investors that they would be "paid", in cash, by "check" in remediation for the loss, injury and damage suffered by such customers as a result of the acts, omissions, statements, breaches of duty and conduct identified above and described, with particularity, in the allegations which follow;

q.     Alternatively and if Ameriprise's representations to that effect are to be believed, caused, suffered, or permitted defendant Sachse and/or unknown persons acting in concert with him, to "impersonate" defendant Cracchiolo as well as Ameriprise employees "Ron Lyle," "Ted Brail" and "Ted Trimble" and, under that guise, to represent to, promise and assure Donelson and Other Investors that they would be paid substantial sums, in

cash, in remediation of the loss, injury and damage which they had suffered as a result of the acts, omissions, statements, breaches of duty and/or conduct identified in this ¶ 1 and otherwise described with particularity in the allegations which follow.

154.    Such Class members are so numerous and dispersed that joinder of all members is impracticable. Record owners, Ameriprise customers who were advised by Sachse and/or were the recipients of representations made to them by Sachse, "Ted Trimble," "Ron Lyle" and/or Ameriprise CEO Cracchiolo may be identified from records maintained by Ameriprise or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

155.    Donelson's claims are typical of the claims of the members of the Class as all Class members are similarly affected by Ameriprise Defendants' wrongful conduct and serial violations of federal law as alleged.

156.    Donelson will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

157.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by Ameriprise Defendants' acts as alleged herein;

b.    Whether Defendants breached their fiduciary duties to Class members;

c.    Whether statements made by Ameriprise Defendants to Class members misrepresented or omitted material facts about their investments; and

d.    To what extent the Class members have sustained damages and the proper measure of damages.

158.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable.  Furthermore, in the

event that damages suffered by individual Class members are relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

159. For all of the reasons and based upon the facts set forth in ¶¶ 25, 27, 33-36, 38-43, 75, 92-93, 97, 100-109, 114, 119-120, 137-138, 140 and 145-146, the decline in the value of the cash, securities, capital and assets held in Donelson's Ameriprise brokerage account as identified, detailed and described with particularity was proximately, efficiently and/or substantially caused by Ameriprise and Ameriprise "Associate Vice President" Sachse, and Ameriprise CEO Cracchiolo and each and every Ameriprise Defendants' fraud, deception, misrepresentation, false statements and/or fraudulent, deceptive and/or manipulative conduct rather than by changing market conditions, changing investor expectations or other unrelated factors.

160. As a direct, proximate and substantial result of such false, fraudulent, misleading and deceptive statements and such fraudulent, deceptive and/or manipulative conduct, Donelson has suffered actual loss, damage and diminution in value in and of the cash, securities, capital and/or assets held in his Ameriprise brokerage account:

   a.  In an amount exceeding $450,000 representing the value of the $194,813 in unencumbered cash and securities held in and by Donelson's brokerage account on January 1, 2012 had such cash and securities not been churned, manipulated, traded on margin and otherwise become the subject of fraud, deception and serial breaches of fiduciary duty but, on the contrary, had been invested and reinvested in a manner sufficient, merely, to achieve the 15.517% annualized return achieved by the S&P 500 during the period from January 1, 2012 through January 1, 2018;

   b.  In a further amount exceeding $10,706 representing "margin interest" charges assessed against Donelson's brokerage account, having a capitalized value of not less than $15,000.

51

## COUNT I
### (Violation of § 10(b) of the Securities Exchange Act and
### Rule 10b-5(a) and (c) Promulgated; Defendants)

161.  Donelson hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein,

162.  Ameriprise carried out, executed and pursued a plan, scheme and course of conduct which was intended to and did in fact deceive and defraud Donelson and Class members to their injury and damage.  In execution, furtherance or pursuit of such unlawful plan, scheme and course of conduct Ameriprise employed the following devices, schemes, and artifices to defraud and engaged in the following acts, practices and courses of conduct operating as a fraud and deceit upon Donelson and the other Class members, all in an effort enrich themselves through the following undisclosed manipulative acts or practices through which they wrongfully generated revenue at the expense of Donelson and other Class members and contrary to the best interests of and in violation of their fiduciary duties to Donelson and Class members:

     a.    As demonstrated in ¶¶ 25 and 27 hereinabove, Sachse informed Donelson that Donelson would not have to trade securities on margin; that Sachse understood Donelson's instruction that no trades were to be accomplished on margin; and that in fact, no securities would be acquired for Donelson's brokerage account on margin when, in truth and in fact and as demonstrated in ¶¶ 100, 101, 109, 114, 119, 120, 137-138.  Ameriprise purchased $446,850 in securities for Donelson's account on margin in the year 2012; $285,063 in securities on margin for Donelson's account in the year 2013; and $197,540 in securities on margin for Donelson's account in the year 2016;

     b.    As demonstrated in ¶¶ 33-36, 43-44 and 75 hereinabove, Ameriprise employee "Ted Brail" as well as Ameriprise "Associate Vice President" Sachse each represented to Donelson that he would receive two checks from Ameriprise totaling $70,000 in compensation for the "problems" associated with Donelson's brokerage account, including the unauthorized purchase of securities for the account "on margin" when in truth and in fact, such checks were not received by Donelson, whether in November or December, 2014, January, 2015 or thereafter and no such checks were ever issued and made payable by Ameriprise to Donelson;

c.      As demonstrated in ¶¶ 38-44 and 75 hereinabove, Sachse informed Donelson that checks totaling $70,000 had in fact been issued by Ameriprise and although they had been sent to Donelson by "UPS delivery," the delivery thereof to Donelson, in fact, had "been messed up by UPS" when in truth and in fact, such checks were not received by Donelson, whether in November or December, 2014, January, 2015 or thereafter and no such checks were ever issued and made payable by Ameriprise to Donelson;

d.      As demonstrated in ¶ 43 and 75, Sachse informed Donelson that he had visited "a UPS facility in Johnson County, Kansas" in order to "pick up" the two checks totaling $70,000 which allegedly had been consigned to UPS for delivery, and then to deliver them personally to Donelson but was informed that the checks had already been "loaded on a UPS truck" for "delivery" to Donelson when in truth and in fact no such checks had ever been consigned to UPS for delivery and no such checks had ever been "loaded" on any UPS vehicle for delivery to Donelson, and no such checks were ever delivered to or received by Donelson;

e.      As demonstrated in ¶¶ 44-48, Sachse informed Donelson that Donelson's brokerage "account statements" were "messed up;" that although these "paper statements" showed that Donelson had only $250,000 in assets in his brokerage account, Sachse, who claimed to be "looking" at Donelson's account as depicted on Sachse's own computer assured and represented to Donelson that his account contained fully $483,000 in cash, and that Donelson should "disregard" whatever was shown on his "paper" account statements, when in truth and in fact, Donelson's brokerage account contained far less than the $483,000 in cash which Sachse represented such account to contain;

f.      As demonstrated in ¶¶ 49-52 and 75, when Donelson requested that Ameriprise send him a check in the amount of $483,000 representing the entirety of the assets which, according to Sachse, were contained in Donelson's brokerage account, Sachse represented to Donelson falsely that Ameriprise would in fact do so and had in fact remitted a check in the amount of $483,000 to Donelson "through UPS" when in truth and in fact, no such check was ever remitted or made payable to Donelson by Ameriprise and no such check was consigned to UPS or any other carrier for delivery to Donelson, and no such checks were ever delivered to or received by Donelson;

g.      As demonstrated in ¶¶ 57-66 and 75, Donelson was informed by Ameriprise "in-house attorney" Ron Lyle and Ameriprise "bean counter" Ted Trimble that Ameriprise's computer system remained "messed up" and that in compensation for the damage occasioned to Donelson as a result of such "messed up" computer system, Ameriprise would remit a further check in the amount of $40,000 in addition to the two checks totaling $70,000 that

53

had been promised earlier, when in truth and in fact, no such additional check in the amount of $40,000 was ever remitted or made payable by Ameriprise to Donelson; that the said "Ron Lyle" and "Ted Trimble" were either fictitious persons, the identity of whom was manufactured and created by Sachse and Ameriprise in order to deceive and defraud Donelson or, in the alternative, were actual, serving bona fide Ameriprise employees who had been deployed and instructed to obscure or conceal Ameriprise's fraudulent, deceptive and/or manipulative conduct with respect to Donelson or to dissuade, hinder or delay Donelson from or in the pursuit of claims arising out of such fraudulent, deceptive and/or manipulative conduct;

h.  As demonstrated in ¶¶ 62 and 75, Ameriprise bean counter "Ted Trimble" and Ameriprise "Associate Vice President" Sachse not only promised Donelson what were, at that juncture, three checks totaling $111,000 but promised to transfer an additional 40,000 shares of Prospect Capital and an additional 40,000 shares of Ferrell Gas to Donelson's account when in truth and in fact, no such additional shares were ever deposited in or credited to Donelson's brokerage account;

i.  As demonstrated in ¶¶ 67-71, "Ameriprise Chairman and CEO" Cracchiolo himself promised that Ameriprise would "give" Donelson two further checks in addition to the three checks already promised, each in the amount of $250,000 as soon as those checks could be "coded into" Ameriprise's computer when in truth and in fact, no such checks were ever issued or made payable by Ameriprise to Donelson and such statements were made by CEO Cracchiolo merely to conceal the fraudulent, deceptive and/or manipulative conduct identified in the Complaint and otherwise to dissuade, hinder or delay Donelson from or in the pursuit of claims against Ameriprise;

j.  As demonstrated in ¶¶ 72-75, Ameriprise CEO Cracchiolo promised Donelson yet a sixth check in the amount of $100,000 to account for the delay, presumably in "coding" these payments "into" Ameriprise's computer system, once again to conceal the fraudulent, deceptive and/or manipulative conduct identified in the Complaint and/or to dissuade, hinder or delay Donelson from or in the pursuit arising out of such fraudulent, deceptive and/or manipulative conduct against Ameriprise;

k.  As demonstrated in ¶¶ 83, 89, 90-91, Ameriprise made the false, fraudulent and deceptive promises and statements and engaged in the deceptive and manipulative conduct identified in ¶¶ 25, 27, 30-43, 75, 92-93, 97, 100, 102, 104-110, 114, 116, 118-119, 121, 129, 137-138, 140 and 145-148 of the Complaint in order to conceal its "double counting" of the same securities as assets of Donelson's brokerage account and to further enhance the value of the account through the purported receipt of unregistered shares in "VDO-BH" which were not traded on any national exchange and which should not have been sold to Donelson since he was not an accredited investor and which were, at all times, worthless;

54

l.   Ameriprise made the false and fraudulent statements and promises and engaged in the fraudulent, deceptive and/or manipulative conduct detailed in ¶¶ 25, 27, 30-36, 38-39, 43, 75, 92-93, 97, 100, 102, 104-110, 114, 116, 118-119, 121, 129, 137-138, 140 and 145-148 of the Complaint in order to conceal Ameriprise's excessive, improper and unlawful buying and selling of securities in Donelson's brokerage account of a kind, type and with a level of frequency that was inappropriate, unjustified and injurious, given Donelson's financial resources and his investment objectives and were transactions which Ameriprise and Sachse consummated for no other purpose and to generate greater profits for themselves;

m.   Ameriprise made the false statements and promises and engaged in the fraudulent, deceptive and/or manipulative conduct detailed in ¶¶ 25, 27, 30-36, 38-43, 75, 92-93, 97, 100, 102, 104-110, 114, 116, 118-119, 121, 129, 137-138, 140 and 145-148 of the Complaint in order to conceal the fraudulent, deceptive and/or manipulative conduct arising out of Ameriprise's statements to Donelson to the effect that the Armor Residential shares which had been purchased for his account had been purchased in reliance upon a "bad tip" received from Merrill Lynch; that Merrill Lynch intended to "compensate" Ameriprise's customers for whatever losses they had sustained in reliance upon that "bad tip;" and that in anticipation of the receipt of such compensation, Donelson should show his Ameriprise shares at a loss exceeding $100,000 and sell all of the shares in his brokerage account which had appreciated in value in order to offset those "gains" with the losses that would be incurred upon the sale of the Armor Residential shares, all as detailed in ¶¶ 122-123 of the Complaint;

n.   Ameriprise made the false and fraudulent statements and promises and engaged in the fraudulent, deceptive and/or manipulative conduct identified in ¶¶ 25, 27, 33-36, 38-43, 75, 92-93, 97, 100-101, 109, 114, 119-120, 137-138, 140 and 145-148 in order to conceal its fraudulent, deceptive and/or manipulative conduct associated with the fact, as detailed in ¶¶ 130-132 and 142-144, Ameriprise distributed a total of $115,000 to Donelson allegedly as "dividends received" upon "Ferrell Gas" and other securities held in Donelson's brokerage account but which were in truth and in fact, liquidations of capital assets held in the account which Donelson had intended, at all times, to hold long-term in the hope of appreciation and eventual use upon his retirement.

163.   For the reasons summarized in, *inter alia*, ¶¶ 147-152, Ameriprise Defendants acted with actual intent to deceive, manipulate and defraud and, at all times, as primary participants in the wrongful and illegal conduct and scheme identified in the preceding paragraph.

164. Ameriprise Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Donelson's brokerage account and those of the Class members, as specified herein.

165. Ameriprise Defendants employed devices and artifices to defraud and engage in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and promotional payments as a result of the undisclosed practices of compelling clients into a fee-based Advisory Program, as alleged herein, and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Class.

166. Donelson and Class members reasonably relied upon the representations of Defendants, who were acting at all times in a fiduciary capacity.

167. Donelson and Class members were ignorant of Defendants' fraudulent scheme. Class members were injured because had Class members known of Ameriprise Defendants' unlawful scheme, they would not have entrusted their assets to Ameriprise.

168. Absent Defendants' wrongful conduct, Donelson and Class members would not have been injured.

169. By virtue of the foregoing, Defendants each violated Section 10(b) of the Securities Exchange Act and SEC Rules 10b-5(a) and (c), 17 C.F.R. 240.10b-5 promulgated thereunder.

170. As a direct and proximate result of Defendants' wrongful conduct, Donelson and Class members suffered injury and damages as detailed in ¶¶ 159-160 hereinabove.

171. This claim has been brought within the applicable statute of limitations.

56

## COUNT II
### (Violation of § 20 of the Securities Exchange Act; Ameriprise Defendants)

172.     Donelson repeats and re-alleges each and every allegation contained above, except that for purposes of this claim, Donelson expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

173.     This claim is brought pursuant to § 20 of the Securities Exchange Act against Ameriprise Defendants as control persons of Ameriprise.  It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information complained about herein are the collective actions of the Control Person Defendants and Ameriprise.

174.     Ameriprise is liable under § 10(b) of the Securities Exchange Act as set forth herein.

175.     Cracchiolo, Petruzillo, Maglaque and O'Connell (hereinafter "Control Person Defendants") were "control persons" of Ameriprise within the meaning of § 15 of the Securities Exchange Act, by virtue of their positions of operational control over Sachse and at all times had the power and authority, directly and indirectly, and exercised the same to cause Ameriprise to engage in the wrongful conduct complained of herein.

176.     Pursuant to § 15 of the Securities Exchange Act, by reason of the foregoing, the Control Person Defendants are liable to Donelson and the other members of the Class to the same extent as is Ameriprise for its primary violations of § 10(b) of the Securities Exchange Act.

177.     By virtue of the foregoing, Donelson and the other members of the Class are entitled to damages against the Control Person Defendants.

## COUNT III
### (Breach of Fiduciary Duty; All Defendants)

178.     Donelson hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

179.     Under Missouri law, stockbrokers owe customers a fiduciary duty. This fiduciary duty includes at least these obligations: to manage the account as dictated by the customer's needs and objectives, to inform the customer of risks in particular investments, to refrain from self-dealing, to follow the customer's order instructions, to disclose any self-interest, to stay abreast of market changes, and to explain strategies. Implicit in these obligations is a duty to disclose to the customer material facts.

180.     In acting as a stockbroker to Donelson and the other Class members, Ameriprise Defendants owed Donelson and the other Class members a fiduciary duty.

181.     Ameriprise Defendants knew that Donelson and the other Class members entrusted their assets to, and totally relied on the relationship of trust established with said Defendants, and thereby intentionally assumed the position of fiduciaries of the assets of Donelson and the other Class members.

182.     Donelson and the other Class members relied exclusively and without reservation upon the representations, course of dealing and expertise of Ameriprise Defendants. In effect, Ameriprise Defendants exercised total discretionary or control authority over the assets of the Donelson and the other Class members in Ameriprise's accounts.

183.     The fiduciary duty owed to Donelson and the other Class members by Ameriprise Defendants required them to manage the accounts of Donelson and the other Class members as dictated by the customer's needs and objectives, to inform the customer of risks in particular investments, to refrain from self-dealing, to follow the customer's order instructions, to disclose

58

any self-interest, to stay abreast of market changes, and to explain strategies. Implicit in these obligations is a duty to disclose to the customer material facts.

184.    The fiduciary duty owed to Donelson and the other Class members by Ameriprise Defendants required that trading the securities held by Donelson and the other Class members required Ameriprise to justify the move as economical.

185.    All of the foregoing fiduciary duties have been breached by Ameriprise Defendants by virtue of the wrongful activities summarized in ¶ 147 hereinabove and said breaches were in all respects willful and intentional and directly and proximately caused Donelson and the other Class members to suffer substantial damages for which Donelson prays for relief, full restitution of an losses, punitive damages and recovery of all costs and expenses, including reasonable attorneys' fees.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Donelson prays for relief and judgment as follows:

A.    Declaring that Ameriprise Defendants are liable pursuant to the Securities Exchange Act;

B.    Declaring that Ameriprise Defendants breached their fiduciary duties;

C.    Determining and certifying that this action is a proper class action, certifying Donelson as class representative, and appointing their counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.    Awarding compensatory damages in favor of Donelson and the Class against Ameriprise Defendants, jointly and severally, for damages sustained as a result of Ameriprise Defendants' wrongdoing, in an amount to be proven at trial;

59

E.      Awarding all appropriate relief, including actual damages, statutory damages, double damages, treble damages, punitive damages, consequential damages, restitution, disgorgement, injunctive and any other appropriate compensatory, equitable, or exemplary relief;

F.      Awarding Donelson and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

G.      Awarding such other relief as the Court may deem just and proper.

Respectfully submitted,

McDOWELL RICE SMITH & BUCHANAN

_/s/ James F.B. Daniels_
James F.B. Daniels, MO Bar #30003
605 W. 47th Street, Suite 350
Kansas City, MO 64112-1905
(816) 753-5400 telephone
(816) 753-9996 telecopier
jdaniels@mcdowellrice.com

ATTORNEYS FOR PLAINTIFF

60